1

HONORABLE RICHARD A. JONES

2

3

4

5

6

7      UNITED STATES DISTRICT COURT, WESTERN DISTRICT OF WASHINGTON
                              AT SEATTLE

8

9   CAPITOL WEST APPRAISALS, LLC, on
    behalf of itself and all others similarly situated,

10                                                      No. 2:08 cv-01520 RAJ

                                    Plaintiff,

11                                                      **SECOND AMENDED CLASS ACTION
                                                        COMPLAINT**

12            v.
                                                        Jury Trial Demanded
13  COUNTRYWIDE FINANCIAL CORP.;
    COUNTRYWIDE BANK, N.A.;
    COUNTRYWIDE HOME LOANS, INC.;

14  LANDSAFE, INC., BANK OF AMERICA,
    N.A., and LANDSAFE APPRAISAL

15  SERVICES, INC.

16                                  Defendants.

17

18

19

20

21

22

23

24

25

26

SECOND AMENDED CLASS ACTION COMPLAINT
Case No. 2:08-cv-01520 RAJ

010076-11 339751 V1



HAGENS BERMAN
SOBOL SHAPIRO LLP
1301 FIFTH AVENUE, SUITE 2900 ● SEATTLE, WA 98101
TELEPHONE (206) 623-7292 ● FACSIMILE (206) 623-0594

## TABLE OF CONTENTS

**PAGE**

I.    NATURE OF THE ACTION ...................................................................1

II.   JURISDICTION AND VENUE ..............................................................4

III.  THE PARTIES........................................................................................5

IV.   SUBSTANTIVE ALLEGATIONS .........................................................7

      A.    The Plaintiff ...............................................................................7

      B.    The Appraisal Business...............................................................7

      C.    Federal Law Requires Appraisal Independence .........................8

      D.    Countrywide's Broad Scheme to Boost Loan Production .........12

            1.    The Countrywide Brokerage Network...........................15

            2.    Countrywide's Inducement of Brokers to Direct Borrowers Towards Subprime Loans .............................17

            3.    Subprime Loans are More Lucrative to Countrywide ...18

      E.    Countrywide Corrupts the Appraisal System ...........................21

            1.    Countrywide's inflated appraisals.................................21

            2.    The blacklisting of honest appraisers............................22

            3.    LandSafe Also Blacklists or Excludes Honest Appraisers ...........27

      F.    The Impact of Countrywide's Unlawful Conduct on Capitol West .........28

      G.    Wade Massey of Capitol West Appraisals was Denied Fair Procedure .........28

            1.    Upper Fitchs Point Rd. Appraisal .................................29

            2.    Rioja Street Appraisal ...................................................31

      H.    Another Example of the Blacklist Scheme ...............................35

      I.    Stock Sales of Mozilo and Sambol ...........................................38

      J.    Governmental Actions Relating to Countrywide's Practices ...................38

V.    CLASS ACTION ALLEGATIONS ......................................................39

SECOND AMENDED CLASS ACTION COMPLAINT - i
Case No. 2:08-cv-01520 RAJ

010076-11  339751 V1

HAGENS BERMAN
SOBOL SHAPIRO LLP

1301 FIFTH AVENUE, SUITE 2900 ● SEATTLE, WA 98101
TELEPHONE (206) 623-7292 ● FACSIMILE (206) 623-0594

A.     Class Definition ........................................................39

B.     Numerosity........................................................40

C.     Commonality........................................................40

D.     Typicality ........................................................40

E.     Adequacy ........................................................41

F.     The Prerequisites to Maintaining a Class Action for Injunctive Relief are Readily Apparent........................................................41

G.     Common Questions Predominate, and the Class Action Device Is Superior ........................................................41

VI.     FRAUDULENT CONCEALMENT; TOLLING; ESTOPPEL........................................................42

VII.     CAUSES OF ACTION ........................................................42

FIRST CAUSE OF ACTION:  VIOLATION OF 18 U.S.C. § 1962(c)(d) ........................................................42

A.     The Enterprises ........................................................43

     1.     The Countrywide Brokerage Enterprise ........................................................43

     2.     Alternative Enterprise Allegations:  The Countrywide Enterprise ........................................................45

B.     The Defendants' Use of the U.S. Mails and Interstate Wire Facilities......47

C.     Conduct of the RICO Enterprises' Affairs........................................................50

D.     The Defendants' Pattern of Racketeering Activity ........................................................50

E.     Damages Caused by the Defendants' Scheme........................................................51

SECOND CAUSE OF ACTION:  VIOLATION OF AND CONSPIRACY TO VIOLATE COMMON LAW DUTY TO PROVIDE FAIR PROCEDURES, AGAINST COUNTRYWIDE AND BANK OF AMERICA ........................................................51

THIRD CAUSE OF ACTION:  INTERFERENCE WITH PROSPECTIVE ECONOMIC ADVANTAGE AGAINST COUNTRYWIDE ........................................................56

PRAYER FOR RELIEF ........................................................58

JURY DEMAND ........................................................59



HAGENS BERMAN
SOBOL SHAPIRO LLP

1301 FIFTH AVENUE, SUITE 2900 ● SEATTLE, WA 98101
TELEPHONE (206) 623-7292 ● FACSIMILE (206) 623-0594

Plaintiff Capitol West Appraisals, LLC ("Plaintiff"), by and through its attorneys, on behalf of itself and all others similarly situated, brings this Class Action Complaint against Defendants and alleges, based upon personal knowledge as to its own acts, and as to all other matters upon information and belief, as follows:

## I.     NATURE OF THE ACTION

1.     The independence and integrity of the real estate appraisers who determine the value of home loan collateral is vitally important.  Appraisals are intended to provide borrowers and lenders with an independent and accurate assessment of the true value of the property underlying a loan.

2.     Federal and state laws exist to protect the integrity of the appraisal process so that appraisers can provide borrowers and lenders with an independent and accurate assessment of the value of a home.  Lenders are prohibited from pressuring appraisers into compromising their independence and producing a report that is not based on the appraiser's objective opinion.

3.     Countrywide embarked on a corporate strategy to underwrite as many loans as possible, including loans that were subprime loans and otherwise did not meet underwriting standards.  Subprime loans have meant that Countrywide has made higher profits in interest rates, in origination fees and other fees, and in packaging the mortgage-backed securities that are at the heart of the financial woes now plaguing our economy.  Countrywide has steered many borrowers into subprime loans when they have qualified for conventional financing with lower rates.

4.     Countrywide, through misrepresentations from standardized sales scripts, standardized training of brokers and loan officers, standardized omissions of crucial information necessary for borrowers to make informed financial choices and incentive programs – which included perks such as all-expense-paid trips to Las Vegas –  has induced brokers and loan officers to push subprime loans or otherwise tainted loans or non-qualifying loans as a matter of standard policy and practice without determining the suitability or unsuitability of the loan for

SECOND AMENDED CLASS ACTION COMPLAINT - 1
Case No. 2:08-cv-01520 RAJ

010076-11  339751 V1

HAGENS BERMAN
SOBOL SHAPIRO LLP

1301 FIFTH AVENUE, SUITE 2900 ● SEATTLE, WA 98101
TELEPHONE (206) 623-7292 ● FACSIMILE (206) 623-0594

1  the borrower, as well as standardized omissions of crucial information necessary for borrowers to

2  make informed financial choices, and other systemic, standardized practices employed by

3  Defendants.

4          5.       As set forth in a recent decision by the Honorable Mariana R. Pfaelzer, in *In re*

5  *Countrywide Fin. Corp. Derivative Litig.*, 554 F. Supp. 2d 1044, 1059 (C.D. Cal. 2008)

6  (hereinafter the "Derivative Action Order"), "The lowest level [Countrywide] employees report

7  [in the Derivative Action complaint] that the impetus to 'push' loans through came from

8  above…. They also allege that the compensation structure promoted these practices by

9  rewarding Company employees – from executives and management down to the underwriters –

10   for increasing loan volume, but not for generating quality loans." As the Derivative Action

11  Order also noted, Countrywide executives concealed this scheme to increase loan volume

12  irrespective of the suitability of the loans to the borrowers. *Id*. at 1058.

13          6.       As part of its corporate objective to abandon underwriting standards in order to

14  maximize market share and profits, Countrywide, the largest mortgage lender in the United

15  States, engaged in a practice of pressuring and intimidating appraisers into using appraisal

16  techniques that meet Countrywide's business objectives even if the use of such appraisal

17  technique is improper and in violation of industry standards. If appraisers fail to "play ball" as

18  Countrywide demands, Countrywide places the appraiser on a "Field Review List," or an

19  Exclusionary List. Countrywide and LandSafe's conduct in this regard is fraudulent because

20  they falsely state defects in appraisers' reports as a basis for being placed on an Exclusionary

21  List. Being placed on the Field Review List is tantamount to being "blacklisted," as

22  Countrywide will no longer accept appraisals from persons and companies appearing on this list

23  unless the appraisals are accompanied by a "Field Review" from another appraiser. Because

24  loan mortgage brokers, which hire the appraisers, will not pay for two appraisals, being placed

25  on the Field Review List means that the appraiser will no longer be retained to review properties

26  on which Countrywide is the lender. As a practical result, mortgage brokers do not know if

HB

HAGENS BERMAN
SOBOL SHAPIRO LLP

1301 FIFTH AVENUE, SUITE 2900 ● SEATTLE, WA 98101
TELEPHONE (206) 623-7292 ● FACSIMILE (206) 623-0594

1  Countrywide will be the eventual lender on a property so mortgage brokers simply will not use

2  blacklisted appraisers – period.  Thus, given Countrywide's enormous size and clout in the

3  mortgage market, appraisers appearing on the Field Review List lose substantial revenue – all

4  because they refused to compromise their integrity and violate their industry standards at

5  Countrywide's insistence.  In essence, being on the blacklist is a virtual death knell for an

6  appraiser who will not do business the Countrywide way, *i.e.*, illegally.

7          7.      When Countrywide finds an appraiser who refuses to violate industry standards,

8  or whom it just does not like, or who will not accept Countrywide's cut-rate fee payments for

9  appraisals, Countrywide uses its enforcement arm, its subsidiary LandSafe, to cut off the

10  offending appraiser.  As part of the scheme, LandSafe performs a "field review" of the appraisers

11  who submit an offending appraisal.  As part of the Countrywide-LandSafe scheme, LandSafe

12  then completes an appraisal that comes out where Countrywide or LandSafe wants it to be.  The

13  phony appraisals are then used to complete the loan and the offending appraiser is blacklisted, on

14  the fraudulent grounds the prior appraisal was inadequately performed.  The acts of pretextually

15  placing appraisers on an Exclusionary List are thus fraudulent, and the communications

16  undertaken to do so are false statements by Countrywide and by LandSafe.  The names of

17  blacklisted appraisers are transmitted to Countrywide and LandSafe's extensive network of

18  brokers – sounding the death knell for honest appraisers.

19          8.      When Countrywide removes appraisers from the list of approved appraisers, it

20  routinely does not provide any notice to the appraisers that they have been removed from that

21  list.  Countrywide provides no meaningful opportunity to rebut the exclusion.  As a result,

22  appraisers frequently do not even know that they have been placed on an exclusionary list.  If

23  Countrywide and LandSafe give notice that an appraiser has been placed on the exclusionary list,

24  the notice is always cursory and fails to provide sufficient detail for the appraiser to know the

25  basis for the removal.  The notices are false statements by Countrywide and LandSafe because

26  they falsely report deficiencies in appraisal reports.  If an appraiser realizes that he or she has

HAGENS BERMAN
SOBOL SHAPIRO LLP

1301 FIFTH AVENUE, SUITE 2900 ● SEATTLE, WA 98101
TELEPHONE (206) 623-7292 ● FACSIMILE (206) 623-0594

1    been placed on the exclusionary list– either through a cursory notice or after realizing that he or

2    she is no longer receiving business from Countrywide – and then inquires about no longer

3    receiving work, Countrywide and LandSafe do not give the appraiser meaningful information

4    and do not give the appraiser an opportunity to seek relief from being blacklisted.

5         9.      This lack of notice and meaningful opportunity to contest the exclusion violates

6    state and federal law which requires such notice.  It is also fraudulent conduct based upon false

7    statements made to appraisers by Countrywide and LandSafe.

8         10.     Defendants' conduct violates, among other laws, the federal Racketeering

9    Influenced and Corrupt Practices Act and state law.  Countrywide and LandSafe have caused

10   substantial damage to thousands of appraisers across the United States, in addition to distorting

11   real estate prices in the marketplace.  Therefore, this suit is necessary to stop Countrywide and

12   LandSafe's unlawful behavior and to compensate appraisers that were subject to Countrywide's

13   unlawful scheme.

14                    **II.    JURISDICTION AND VENUE**

15        11.     This Court has subject-matter jurisdiction over this class action pursuant to the

16   Class Action Fairness Act of 2005, which confers federal jurisdiction over class actions where,

17   as here, "any member of a class of plaintiffs is a citizen of a State different from any

18   Defendants" and the aggregated amount in controversy exceeds five million dollars

19   ($5,000,000).  *See* 28 U.S.C. §§ 1332(d)(2) and (6).  This Court has personal jurisdiction over

20   the parties because Plaintiff submits to the jurisdiction of the Court and Defendants

21   systematically and continually conduct business throughout the State of Washington.

22        12.     Venue is proper in this Court pursuant to 28 U.S.C. §§ 1391(b) and (c).  Many of

23   the acts and transactions giving rise to the violations of law complained of herein occurred in this

24   District.

25

26

SECOND AMENDED CLASS ACTION COMPLAINT - 4
Case No. 2:08-cv-01520 RAJ

HAGENS BERMAN
SOBOL SHAPIRO LLP
1301 Fifth Avenue, Suite 2900 ● Seattle, WA 98101
TELEPHONE (206) 623-7292 ● FACSIMILE (206) 623-0594

13.    Much of Defendants' activities and operations have been performed in this District, and Defendants maintain many offices in this District, including at the following locations:

| | | |
|---|---|---|
| 810 Alabama Street<br>Bellingham, WA 98225 | 221 A Street, Ste #4<br>Eastsound, WA 98245 | 11555 SE 8th St, Ste 101<br>Bellevue, WA 98004 |
| 200 112th Ave NE<br>Suite 210<br>Bellevue, WA 98004 | Bellevue Place<br>10500 NE 8th St, Ste 1760<br>Bellevue, WA 98004 | 2210 Riverside Drive<br>Suites 110&120<br>Mt. Vernon, WA 98273 |
| 1 Front Street, Ste E-2<br>Friday Harbor, WA 98250 | 1645 140th Ave NE, Ste A3<br>Bellevue, WA 98005 | 1200 Third Ave. Suite 100<br>Seattle, WA 98101 |
| 3400 188th St., Suite 101<br>Lynnwood, WA 98037 | 2103 NE 129th St, Suite 201<br>Vancouver, WA 98686 | 8525 120th Ave NE<br>Kirkland, WA 98275 |
| Eastlake Center<br>2825 Eastlake Ave E,<br>Suite 305<br>Seattle, WA 98102 | Westgate North Shopping<br>Center<br>2631 N Pearl St<br>Tacoma, WA 98407 | Westwood Village<br>2515 SW Trenton Street<br>Suite 103<br>Seattle, WA 98126 |
| Greentree Plaza<br>305 SE Everett Mall Wy #21<br>Everett, WA 98208 | 5500 Olympic Drive<br>Suite H-103<br>Gig Harbor, WA 98335 | Lakewood Pavilion<br>5700 100th St SW, Ste 550<br>Lakewood, WA 98499 |
| Rainier Professional Plaza<br>18209 ST Hwy 410 E, #302<br>Bonney Lake, WA 98391 | 32001 32nd Avenue S<br>Suite 110<br>Federal Way, WA 98001 | Cooper Point Pavilion<br>1520 Cooper Pt Rd SW #350<br>Olympia, WA 98502 |
| The Clocktower at Town<br>Center<br>15021 Main St, Ste C<br>Mill Creek, WA 98012 | Vancouver Center North<br>Office Tower<br>700 Washington St Ste 201<br>Vancouver, WA 98660 | Triangle Landing<br>1208 Washington Way<br>#140,150<br>Longview, WA 98632 |
| 350 North East 4th Ave<br>Camas, WA 98607 | The Western Creek Building<br>5001 25th Ave NE, Ste 201<br>Seattle, WA 98105 | |

## III.    THE PARTIES

14.    Plaintiff Capitol West Appraisals, LLC ("Capitol West") is an Idaho limited liability company with its principal place of business in Boise, Idaho. Capitol West is in the business of providing real estate appraisals to mortgage brokers and mortgage lenders.

HAGENS BERMAN<br>SOBOL SHAPIRO LLP

1301 Fifth Avenue, Suite 2900 ● Seattle, WA 98101<br>TELEPHONE (206) 623-7292 ● FACSIMILE (206) 623-0594

15.     Defendant Countrywide Financial Corp. ("Countrywide Financial") is a Delaware corporation headquartered at 4500 Park Granada, Calabasas, California 91302. Countrywide Financial is engaged in mortgage lending and other real estate finance-related businesses, including mortgage banking, banking and mortgage warehouse lending, dealing in securities and insurance underwriting.

16.     Defendant Countrywide Bank, N.A. ("Countrywide Bank") is a national banking association headquartered at 1199 North Fairfax Street, Suite 500, Alexandria, Virginia 22314. Countrywide Bank is a subsidiary of Countrywide Financial and funds loans for Countrywide Financial's mortgage banking segment.

17.     Defendant Countrywide Home Loans, Inc. ("Countrywide Home Loans") is a New York corporation headquartered at 4500 Park Granada Blvd, Calabasas, California 91302. Countrywide Home Loans is a subsidiary of Countrywide Financial and engages in the business of originating mortgage loans.

18.     Collectively, these entities are referred to as "Countrywide."

19.     Defendant Bank of America, N.A. ("B of A") is headquartered in Charlotte, North Carolina. B of A acquired Countrywide on August 23, 2007 and now operates Countrywide's mortgage business under the banner Bank of America Home Loans.

20.     Defendant LandSafe, Inc. ("LandSafe") is a Delaware corporation headquartered at 6400 Legacy Drive, Plano, Texas 75024. LandSafe is a subsidiary of Countrywide Financial, and provides loan closing products and services such as credit reports, appraisals, property valuation services and flood determinations.

21.     Defendant LandSafe Appraisal Services, Inc. ("LandSafe Appraisal") is a California corporation headquartered at 6400 Legacy Drive, Plano, Texas 75024. LandSafe Appraisal is a subsidiary of Countrywide Financial, and offers appraisal services in connection with mortgage loan closings.

22.     Collectively, LandSafe and LandSafe Appraisal are referred to as LandSafe.

HAGENS BERMAN
SOBOL SHAPIRO LLP
1301 FIFTH AVENUE, SUITE 2900 ● SEATTLE, WA 98101
TELEPHONE (206) 623-7292 ● FACSIMILE (206) 623-0594

1

## IV.    SUBSTANTIVE ALLEGATIONS

2

**A.    The Plaintiff**

3       23.    Plaintiff Capitol West is an independent appraiser serving the 18 counties in

4    Idaho.  Capitol West has been in business since 2005.

5       24.    Capitol West has historically conducted appraisals for area mortgage brokers and

6    major mortgage lenders such as Countrywide, Wells Fargo, Washington Mutual and others.  Due

7    to its experience and expertise, Capitol West is a "review appraiser" for Wells Fargo, WAMU

8    and others.

9       25.    Wade Massey is the owner and head appraiser at Capitol West.  Wade Massey has

10   worked as a certified residential appraiser since 2006.  Mr. Massey completes appraisals for

11   brokers, lenders, and Appraisal Management Companies.  He has satisfied all education and

12   continuing education requirements for the Appraisal Institute of the State of Idaho.  He has also

13   been approved by the Department of Housing and Urban Development to perform Federal

14   Housing Administration appraisals.  Mr. Massey, as described below, has been blacklisted by

15   Countrywide and Bank of America.

16   **B.    The Appraisal Business**

17      26.    An appraiser is most commonly retained by a mortgage broker or mortgage lender

18   in order to value the property that will be used as the collateral to make sure that the property's

19   value actually reflects the estimated opinion of market value or refinance value.  This helps

20   ensure that the loan is adequately collateralized in case the borrower defaults.

21      27.    Among other things, an appraiser typically performs a physical inspection of the

22   property and takes inventory of the number of rooms and square footage and assesses the overall

23   condition of the property.  The appraiser also reviews recent property sales that the appraiser

24   believes are comparable to the property being studied, and these "comps" serve as value

25   benchmarks with which to compare the proposed purchase price for the property.

26

SECOND AMENDED CLASS ACTION COMPLAINT - 7
Case No. 2:08-cv-01520 RAJ

010076-11  339751 V1

HAGENS BERMAN
SOBOL SHAPIRO LLP
1301 FIFTH AVENUE, SUITE 2900 ● SEATTLE, WA 98101
TELEPHONE (206) 623-7292 ● FACSIMILE (206) 623-0594

1    28.    After the appraiser has concluded his or her review, the appraiser typically

2    provides the mortgage broker or lender with a report that either estimates the value of the

3    property or confirms or challenges the sale price agreed to between the buyer and the seller.

4    29.    Appraisers either work "in house" as part of the broker's or lender's own

5    operations or work as independent contractors.  In the latter case, the appraiser builds a book of

6    business by servicing as many mortgage brokers and lenders in a given geographic region as

7    possible.

8    30.    These brokers and lenders are the "lifeblood" of the appraiser's revenue.  Without

9    their business, an appraiser cannot operate.

10   **C.    Federal Law Requires Appraisal Independence**

11   31.    Because of the importance of appraisals in the home lending market, state and

12   federal statutes and regulations require that appraisals be accurate and independent.  The

13   Uniform Standards of Professional Appraisal Practice ("USPAP"), incorporated into federal law,

14   12 C.F.R. § 34.44, require appraisers to conduct their appraisals independently:  "An appraiser

15   must perform assignments with impartiality, objectivity, and independence, and without

16   accommodation of personal interests.  In appraisal practice, an appraiser must not perform as an

17   advocate for any party or issue."  USPAP Ethics Rule (Conduct).  USPAP rules also provide that

18   "[a]n appraiser must not accept an assignment that includes the reporting of predetermined

19   opinions and conclusions."  In addition, each appraisal report must contain a certification signed

20   by the appraiser, stating that his or her compensation for completing the assignment is not

21   contingent upon the development or reporting of a predetermined value or direction in value that

22   favors the cause of the client.

23   32.    USPAP is incorporated into federal law by 12 C.F.R. § 34.44, and federal law sets

24   independence standards for appraisers involved in federally-regulated transactions.  *See* 12

25   U.S.C. §§ 3331, *et seq.*  The Code of Federal Regulations provides that an in-house or "staff"

26   appraiser at a bank "must be independent of the lending, investment, and collection functions and

SECOND AMENDED CLASS ACTION COMPLAINT - 8
Case No. 2:08-cv-01520 RAJ

010076-11  339751 V1

HAGENS BERMAN
SOBOL SHAPIRO LLP

1301 FIFTH AVENUE, SUITE 2900 ● SEATTLE, WA 98101
TELEPHONE (206) 623-7292 ● FACSIMILE (206) 623-0594

1  not involved, except as an appraiser, in the federally related transaction, and have no direct or

2  indirect interest, financial or otherwise, in the property." 12 C.F.R. § 34.45.  For appraisers who

3  are independent contractors or "fee" appraisers, the regulation states that "the appraiser shall be

4  engaged directly by the regulated institution or its agent, and have no direct or indirect interest,

5  financial or otherwise, in the property transaction." 12 C.F.R. § 34.45.

6        33.    Because of the importance of appraisals in the home lending market, state and

7  federal statutes and regulations require that appraisals be accurate and independent.  USPAP,

8  which is incorporated into California law, Cal. Code Reg., Title 10, § 3701, requires appraisers

9  to conduct their appraisals independently:  "An appraiser must perform assignments with

10 impartiality, objectivity, and independence, and without accommodation of personal interests.  In

11 appraisal practice, an appraiser must not perform as an advocate for any party or issue." USPAP

12 Ethics Rule (Conduct).  USPAP rules also provide that "[a]n appraiser must not accept an

13 assignment that includes the reporting of predetermined opinions and conclusions." In addition,

14 each appraisal report must contain a certification signed by the appraiser, stating that his or her

15 compensation for completing the assignment is not contingent upon the development or reporting

16 of a predetermined value or direction in value that favors the cause of the client.  The Director of

17 California's Office of Real Estate Appraisers may "issue a citation, order of abatement, assess a

18 fine or private or public reproval, suspend or revoke any license, and/or may deny the issuance or

19 renewal of a license of any person who has … [v]iolated any provision of USPAP." Cal. Code

20 Reg., Title 10, § 3721(6).

21        34.    California Civil Code section 1090.5(a) states, "No person with an interest in a

22 real estate transaction involving an appraisal shall improperly influence or attempt to improperly

23 influence, through coercion, extortion, or bribery, the development, reporting, result, or review

24 of a real estate appraisal sought in connection with a mortgage loan."  And section 1090.5(c)

25 states, "If a person who violates this section is licensed under any state licensing law and the

26 violation occurs within the course and scope of the person's duties as a licensee, the violation

SECOND AMENDED CLASS ACTION COMPLAINT - 9
Case No. 2:08-cv-01520 RAJ

010076-11 339751 V1

HAGENS BERMAN
SOBOL SHAPIRO LLP
1301 FIFTH AVENUE, SUITE 2900 ● SEATTLE, WA 98101
TELEPHONE (206) 623-7292 ● FACSIMILE (206) 623-0594

1   shall be deemed a violation of that state licensing law." Further, California Business and

2   Professions Code section 11323 states, "No licensee shall engage in any appraisal activity in

3   connection with the purchase, sale, transfer, financing, or development of real property if his or

4   her compensation is dependent on or affected by the value conclusion generated by the

5   appraisal."

6       35.    California's Department of Financial Institutions sent out a notice on February 4,

7   2009, stating that it "is the jointly held intention of the Commissioners of the Department of Real

8   Estate (DRE), the Department of Corporations (DOC), the Department of Financial Institutions

9   (DFI), as well as the Director of the Office of Real Estate Appraisers (OREA), to provide

10  outreach to their respective licensees for the purpose of informing those licensees that the

11  following acts may constitute evidence of a violation of California law, and Civil Code section

12  1090.5 in particular, and should be avoided when engaging the services of a licensed real estate

13  appraiser." The notice further states that the unlawful acts include "allowing the removal of an

14  appraiser from a list of qualified appraisers, or the addition of an appraiser to an exclusionary list

15  of disapproved appraisers, used by any entity, without prior written notice to such appraiser,

16  which notice shall include written evidence of the appraiser's illegal conduct, a violation of the

17  Uniform Standards of Professional Appraisal Practice (USPAP) or state licensing standards,

18  substandard performance, improper or unprofessional behavior or other substantive reason for

19  removal."

20      36.    Federal law sets independence standards for appraisers involved in federally-

21  regulated transactions. *See* 12 U.S.C. §§ 3331, *et seq.* The Code of Federal Regulations

22  provides that an in-house or "staff" appraiser at a bank "must be independent of the lending,

23  investment, and collection functions and not involved, except as an appraiser, in the federally

24  related transaction, and have no direct or indirect interest, financial or otherwise, in the

25  property." 12 C.F.R. § 34.45. For appraisers who are independent contractors or "fee"

26  appraisers, the regulation states that "the appraiser shall be engaged directly by the regulated

HAGENS BERMAN
SOBOL SHAPIRO LLP

1301 FIFTH AVENUE, SUITE 2900 ● SEATTLE, WA 98101
TELEPHONE (206) 623-7292 ● FACSIMILE (206) 623-0594

1    institution or its agent, and have no direct or indirect interest, financial or otherwise, in the

2    property transaction."  12 C.F.R. § 34.45.

3           37.    In 2005, federal regulators, including the Office of Thrift Supervision ("OTS"),

4    published "Frequently Asked Questions on the Appraisal Regulations and the Interagency

5    Statement on Independent Appraisal and Evaluation Functions."  With regard to appraisal

6    independence, the document highlighted the importance of independence and condemned

7    attempts to interfere therewith:

8           3.    *Who should be considered the loan production staff for*
                  *purposes of achieving appraiser independence?  Could*
9                 *loan production staff select an appraiser?*

10          *Answer:*    The loan production staff consists of those
                         responsible for generating loan volume or
11                       approving loans, as well as their subordinates.  This
                         would include any employee whose compensation
12                       is based on loan volume.  Employees responsible
                         for the credit administration function or credit risk
13                       management are not considered loan production
                         staff.  Loan production staff should not select
14                       appraisers.

15                                    * * *

16          5.    *When selecting residential appraisers, may loan production*
                  *staff use a revolving pre-approved appraiser list, provided*
17                *the list is not under their control?*

18          *Answer:*    Yes, loan production staff may use a revolving,
                         board-approved list to select a residential appraiser,
19                       provided the development and maintenance of the
                         list is not under their control.  Staff responsible for
20                       the development and maintenance of the list should
                         be independent of the loan production process. . . .
21                       Further, there should be periodic internal review of
                         the appraiser selection process to ensure that
22                       appropriate procedures are being followed and that
                         controls exist to ensure independence.

23          38.    On its current website LandSafe recognizes the importance of "independent

24    appraisals":

25          **Appraiser Independence**
            The issue of appraiser independence is taken very seriously at

26



LandSafe. As a company, we are firmly committed to ensuring our operational environment enables you to make an independent judgment of value for every property you are assigned to appraise, absent undue influence. To reinforce our long-standing position on this important issue, we recently adopted a newly-stated internal policy on appraiser independence, which states:

"LandSafe Appraisal Services, Inc., an appraisal management company, is committed to providing a process through which its appraisers are able to provide their independent judgment for the property they are asked to appraise. LandSafe promotes and requires an operating environment for its appraisers that is consistent with the vision and requirements established by federal and state guidelines. The environment is designed to mandate independence and maintain an appraisal process that is free from undue influence."

This policy is guided by the Federal Interagency Appraisal and Evaluation Guidelines (FIRREA) of 1994, as amended. These guidelines detail the need for the collateral evaluation function in the real estate loan process to be independent from the loan production function in federally regulated institutions.

Todd Baur, President and Chief Operating Officer, described appraisal independence for LandSafe as a fundamental principal that fosters an environment in which property value is assessed in its purest form.

[http://www.landsafe.com/landsafe/services/appraisal/index.html.]

39.     Because of the state and federal regulations requiring independence between loan production and appraisals, Countrywide created and separately incorporated LandSafe, rather than simply having it exist as a division of Countrywide.

**D.      Countrywide's Broad Scheme to Boost Loan Production**

40.     The Scheme at issue is part of a larger scheme orchestrated by Countrywide's CEO Angelo Mozilo and David Sambol.  Their larger scheme was to drive up Countrywide's revenues through an abandonment of prudent underwriting standards.  The increase in revenues was engineered to drive up Countrywide's stock price which in turn allowed these individuals to reap tremendous fortunes by selling massive amounts of Countrywide stock.

41.     In 2004, Countrywide became the largest home mortgage lender in the United States, built on years of primarily offering customary fixed-rate mortgage loans to borrowers.

HAGENS BERMAN
SOBOL SHAPIRO LLP
1301 FIFTH AVENUE, SUITE 2900 ● SEATTLE, WA 98101
TELEPHONE (206) 623-7292 ● FACSIMILE (206) 623-0594

1    By that time, Countrywide, led by its CEO and founder Angelo Mozilo, was intent on elbowing

2    out competing lenders that tried to horn in on Countrywide's market share by originating more

3    exotic mortgage loans.  As a result, Countrywide's mortgage portfolio – and lending standards –

4    changed dramatically.

5          42.    From mid-2003 onward, Countrywide continually loosened its underwriting

6    guidelines to the point of nearly abandoning them by 2006.  Countrywide's highest-level

7    managers authored official documents – underwriting matrices and guidelines – such as those for

8    Countrywide's Corresponding Lending Division ("CLD") that memorialized Countrywide's

9    systematically lowered lending standards.  Numerous Confidential Witnesses ("CWs") from

10   different levels and involved in different aspects of the company corroborate the nature of

11   Countrywide's strategy shift.  Chairman and CEO Angelo Mozilo's stated goal was to gain 30%

12   market share.  To do so, he and other high-ranking executives at Countrywide ordered many of

13   the lowered standards.

14         43.    Underwriting standards changed so much during the class period that, in

15   December 2007, Countrywide told reporters that billions of dollars of loans in 2005 and 2006

16   could not have been made under "new" guidelines.

17         44.    Whereas in 2003, adjustable rate mortgages ("ARMs") made up 18 percent of

18   Countrywide's portfolio, by 2004, the number of ARM loans increased dramatically, to 49

19   percent of all loans.  Subprime loans rose from 4.6 percent to 11 percent of all loans during the

20   same period.  By offering these loans, and other non-traditional loans like interest-only loans and

21   reduced documentation, Countrywide was not only able to maintain its marketshare, it also

22   earned a significant profit off of the higher commissions that borrowers paid and the higher

23   prices investors were willing to pay for these loans as securitized assets on the secondary market.

24         45.    Countrywide originated, sold, and serviced both prime and subprime (which

25   Countrywide's periodic filings referred to as "nonprime") mortgage loans.  By 2005,

26   Countrywide was the largest U.S. mortgage lender in the United States, originating over $490

SECOND AMENDED CLASS ACTION COMPLAINT - 13
Case No. 2:08-cv-01520 RAJ

010076-11  339751 V1

HAGENS BERMAN
SOBOL SHAPIRO LLP

1301 FIFTH AVENUE, SUITE 2900 ● SEATTLE, WA 98101
TELEPHONE (206) 623-7292 ● FACSIMILE (206) 623-0594

1  billion in mortgage loans in 2005, over $450 billion in 2006, and over $408 billion in 2007.

2  Countrywide recognized pre-tax earnings of $2.4 billion and $2 billion in its loan production

3  divisions in 2005 and 2006, respectively, and a pre-tax loss of $1.5 billion its loan production

4  division in 2007.

5          46.      Countrywide pooled most of the loans it originated and sold them in secondary

6  mortgage market transactions.  Countrywide sold the pooled loans either through whole loan

7  sales or securitization.  In whole loan sales, Countrywide sold the loans to investors and recorded

8  gains on the sales.  In securitizations, Countrywide sold interests in the pooled loans, *i.e.*,

9  mortgage-backed securities.  Countrywide's loan sales were run out of its capital markets

10  division.  In 2005, Countrywide reported $451.6 million in pre-tax earnings from capital market

11  sales, representing 10.9% of its pre-tax earnings; in 2006, it recognized $553.5 million in pre-tax

12  earnings from that division, representing 12.8% of its pre-tax earnings, and in 2007 it recognized

13  a mere $14.9 million in pre-tax earnings from that division, reporting a pre-tax loss overall.

14          47.      Historically, Countrywide's primary business had been originating prime

15  conforming loans that were saleable to the Government Sponsored Entities ("GSEs").  In the

16  fiscal years 2001, 2002, and 2003, Countrywide's prime conforming originations were 50%,

17  59.6%, and 54.2% of its total loan originations, respectively.  In 2003, United States residential

18  mortgage production reached a record level of $3.8 trillion.  Countrywide experienced record

19  earnings in that year, with net earnings of $2.4 billion, an increase of $1.5 billion, or 182%, over

20  2002.  In 2004, in a market where originations were declining overall, Countrywide maintained

21  net earnings of $2.1 billion, and increased its market share from 11.4% to 12.7%.

22          48.      Countrywide achieved this result in large part by moving away from its historical

23  core business of prime mortgage underwriting to aggressively matching loan programs being

24  offered by other lenders, even monoline subprime lenders.  As a result, as reported in

25  Countrywide's periodic filings and reflected in the chart below, in 2004, 2005, and 2006,

26

HAGENS BERMAN
SOBOL SHAPIRO LLP

1301 FIFTH AVENUE, SUITE 2900 ● SEATTLE, WA 98101
TELEPHONE (206) 623-7292 ● FACSIMILE (206) 623-0594

1    Countrywide wrote more non-conforming, subprime, and home equity loans than in any prior

2    period:

| | 2001 | 2002 | 2003 | 2004 | 2005 | 2006 |
|---|---|---|---|---|---|---|
| **Prime Conforming** | 50% | 59.6% | 54.2% | 38.2% | 32% | 31.9% |
| **Prime Non-Conforming** | 16.5% | 24.5% | 31.4% | 38.7% | 47.2% | 45.2% |
| **Home Equity** | 6.8% | 4.6% | 4.2% | 8.5% | 9.0% | 10.2% |
| **Nonprime (Subprime)** | 7.8% | 3.7% | 4.6% | 11.0% | 8.9% | 8.7% |
| **FHA/VA** | 18.9% | 7.6% | 5.6% | 3.6% | 2.1% | 2.8% |
| **Commercial** | 0.0% | 0.0% | 0.0% | 0.0% | 0.8% | 1.2% |

49.    In 2004, Countrywide's reported production of conventional conforming loans
dropped to 38.2%, its production of subprime loans had risen to 11%, its production of home
equity loans had risen to 8.5%, and its production of conventional non-conforming loans had
risen to 38.7%. By 2006, Countrywide had turned its prior business model on its head: a mere
31.9% of its originations were conforming, 45.2% were non-conforming, 8.7% were subprime,
and 10.2% were home equity.

### 1.    The Countrywide Brokerage Network

50.    Countrywide also has made home mortgage loans arranged by its network of
mortgage brokers. Brokers became authorized to become an approved Countrywide broker by
submitting a Mortgage Broker Application and entering into a "Wholesale Broker Agreement"
with Countrywide. These contracted brokers were provided access to Countrywide's CLUES™
computer system, which was designed to allow the mortgage broker to submit loan information
and receive a qualified underwriting decision within minutes. The CLUES™ computer system
purportedly automated the process of placing loans, and was pre-programmed to push as many
borrowers as possible into risky subprime loans, irrespective of reasonable objective criteria that
would indicate the appropriateness of such loans for a particular borrower.

HAGENS BERMAN
SOBOL SHAPIRO LLP
1301 FIFTH AVENUE, SUITE 2900 ● SEATTLE, WA 98101
TELEPHONE (206) 623-7292 ● FACSIMILE (206) 623-0594

51.     Countrywide has incentivized its brokers to push subprime loans by offering larger commissions on subprime loans than on prime loans, and by offering special perks, such as all-expense-paid trips to Las Vegas, to brokers who successfully pushed a large number of subprime loans onto borrowers.  Countrywide's mortgage brokers have induced borrowers to enter into loans via telemarketing and other sales efforts that have been carefully directed by Countrywide.  Those loans are made in reliance on Countrywide's credit-granting policies and with the participation of Countrywide.

52.     Countrywide has needed its network of authorized brokers to accomplish its scheme, as Countrywide could not have reaped huge rewards from the securitization of its subprime loans without a network of brokers across the country pushing borrowers into as many subprime loans as they could.  For instance, a single broker could never have generated the volume of subprime loans needed to bundle the loans into securities, which is where the real money lay for Countrywide.  Countrywide has needed thousands of brokers to work with a single goal in mind – to make as many subprime loans as possible to bundle and sell on the secondary market, irrespective of their suitability for the borrowers.

53.     Countrywide and its brokerage network shared the common purpose of originating as many loans as possible, irrespective of suitability for the borrower, and the more onerous the loan terms, the better.  Through this common purpose, members of the brokerage network received more money from Countrywide, and Countrywide made more money in the secondary market by packaging and selling these loans.

54.     This industry change has transformed incentives in such a manner that lenders have often been less vigilant in accepting risky loans since the risk is quickly transferred to the purchasers of the loans.  The lender's interest in ensuring the accuracy of the appraisal backing the loan is diminished.  And because lenders' profits are determined by the quantity of loans that they successfully close, and not the quality of those loans, the lender has an incentive to pressure

SECOND AMENDED CLASS ACTION COMPLAINT - 16
Case No. 2:08-cv-01520 RAJ

010076-11  339751 V1

HAGENS BERMAN
SOBOL SHAPIRO LLP
1301 FIFTH AVENUE, SUITE 2900 ● SEATTLE, WA 98101
TELEPHONE (206) 623-7292 ● FACSIMILE (206) 623-0594

appraisers to reach values that will allow the loan to close – without regard to whether the appraisal accurately reflects the home's actual value.

55.     Independent mortgage brokers also make more money by closing a higher volume of loans.  Consequently, brokers have great incentive to make the loan documentation process move as quickly and efficiently as possible and meet whatever demands and requirements that lenders place on them.  An independent mortgage broker is not tied to one particular lender.  It typically has relationships with multiple lenders in order to have as many options as possible to service clients.

**2.     Countrywide's Inducement of Brokers to Direct Borrowers Towards Subprime Loans**

56.     Countrywide's brokers and sales representatives have been rewarded for making as many risky, high-cost loans as possible, pursuant to the Company's commission structure.

57.     Even where borrowers qualify for prime loans, Countrywide improperly incentivizes and encourages its brokers, through financial incentives, to move them into the subprime category.  For example, Countrywide has paid commissions on a subprime loan of 0.50% of the loan's value, while the commission on loans in the next highest category would be a mere 0.20% of the loan's value.

58.     In addition, mortgage brokers' commissions would vary on loans in which the interest rate would increase after a short period with a low teaser rate; the higher the reset interest rate, the greater the commission earned.

59.     The addition of penalties to the terms of a loan has also been strongly encouraged and incentivized by Countrywide.  For example, on information and belief, adding a three-year prepayment penalty to a loan would generate an extra 1% of the loan's value in a commission to the salesperson.  Nowhere, however, was this disclosed to prospective loan applicants.

60.     Moreover, if a broker convinced a borrower to add a home equity line of credit to their loan, the broker would earn an extra 0.25% commission.

SECOND AMENDED CLASS ACTION COMPLAINT - 17
Case No. 2:08-cv-01520 RAJ

010076-11  339751 V1

HAGENS BERMAN
SOBOL SHAPIRO LLP

1301 FIFTH AVENUE, SUITE 2900 ● SEATTLE, WA 98101
TELEPHONE (206) 623-7292 ● FACSIMILE (206) 623-0594

61.    A broker's inducing borrowers to take out subprime loans was even rewarded, in some instances, by perks such as all-expense-paid trips to Las Vegas and other places.

62.    In addition to the foregoing, Countrywide has utilized computer software which prevented sales representatives from inputting a borrower's cash reserves when calculating the type of loan the borrower is eligible for, which has resulted in the sales representative pitching a higher cost loan.  Countrywide has utilized this software in order to increase its own profit on such loans, since a borrower who has more assets would normally be able to obtain a lower interest rate on their loan.

### 3.    Subprime Loans are More Lucrative to Countrywide

63.    Defendants' deceptive scheme had one primary goal – to supply the secondary market with as many loans as possible, ideally loans that would earn the highest premiums.  Over a period of several years, Defendants constantly expanded Countrywide's share of the consumer market for mortgage loans through a wide variety of deceptive practices, undertaken with the direction, authorization, and ratification of Sambol and Mozilo, in order to maximize its profits from the sale of those loans to the secondary market.

64.    While Countrywide retained ownership of some of the loans it originated, it sold the vast majority of its loans on the secondary market, either as mortgage-backed securities or as pools of whole loans.

65.    In the typical securitization transaction involving mortgage-backed securities, loans were "pooled" together and transferred to a trust controlled by the securitizer, such as Countrywide.  The trust then created and sold securities backed by the loans in the pool.  Holders of the securities received the right to a portion of the monthly payment stream from the pooled loans, although they were not typically entitled to the entire payment stream.  Rather, the holders received some portion of the monthly payments.  The securitizer or the trust it controlled often retained an interest in any remaining payment streams not sold to security holders.  These

SECOND AMENDED CLASS ACTION COMPLAINT - 18
Case No. 2:08-cv-01520 RAJ

010076-11  339751 V1

HAGENS BERMAN
SOBOL SHAPIRO LLP
1301 FIFTH AVENUE, SUITE 2900 ● SEATTLE, WA 98101
TELEPHONE (206) 623-7292 ● FACSIMILE (206) 623-0594

1  securitization could involve the pooling of hundreds or thousands of loans, and the sale of many

2  thousands of shares.

3       66.    Countrywide generated massive revenues through these loan securitizations.  Its

4  reported securities trading volume grew from $647 billion in 2000, to $2.9 trillion in 2003, $3.1

5  trillion in 2004, $3.6 trillion in 2005, and $3.8 trillion in 2006.  (These figures relate to the

6  ostensible values given to the securities by Countrywide or investors, and include securities

7  backed by loans made by other lenders and purchased by Countrywide.)

8       67.    For the sale of whole (*i.e.*, unsecuritized) loans, Countrywide pooled loans and

9  sold them in bulk to third-party investors, often (but not exclusively) Wall Street firms.  The sale

10  of whole loans generated additional revenues for Countrywide.  Countrywide often sold the

11  whole loans at a premium, meaning that the purchaser paid Countrywide a price in excess of

12  100% of the total principal amount of the loans included in the loan pool.

13       68.    The price paid by purchasers of securities or pools of whole loans varied based on

14  the demand for the particular types of loans included in the securitization or sale of whole loans.

15  The characteristics of the loans, such as whether the loans are prime or subprime, whether the

16  loans have an adjustable or fixed interest rate, or whether the loans include a prepayment

17  penalty, all influenced the price.

18       69.    Various types of loans and loan terms earned greater prices, or "premiums," in the

19  secondary market.  For example, investors in mortgages and mortgage-backed securities have

20  been willing to pay higher premiums for loans with prepayment penalties.  Because the

21  prepayment penalty deters borrowers form refinancing early in the life of the loan, it essentially

22  ensures that the income stream from the loan will continue while the prepayment penalty is in

23  effect.  Lenders, such as Countrywide, typically sought to market loans that earned it higher

24  premiums, including loans with prepayment penalties.

25

26

SECOND AMENDED CLASS ACTION COMPLAINT - 19
Case No. 2:08-cv-01520 RAJ

010076-11  339751 V1

70.     In order to maximize the profits earned by the sale of its loans to the secondary market, Countrywide's business model increasingly focused on finding ways to generate an ever larger volume of the types of loans most demanded by investors.

71.     Countrywide originated as many loans as possible not only to maximize its profits on the secondary market, but to earn greater profits from servicing the mortgages it sold. Countrywide often retained the right to service the loans it securitized and sold as pools of whole loans. The terms of the securitizations and sales agreements for pools of whole loans authorized Countrywide to charge the purchasers a monthly fee for servicing the loans, typically a percentage of the payment stream on the loan.

72.     Tantalized by the huge profits earned by selling loans to the secondary market, Defendants constantly sought to increase Countrywide's market share:  the greater the number and percentage of loans it originated, the greater the revenue it could earn on the secondary market.  Countrywide executives, including defendant Mozilo, publicly stated that they sought to increase Countrywide's market share to 30% of all mortgage loans made and HELOCs extended in the country.

73.     In its 2006 annual report, Countrywide trumpeted the fact that "[w]hile the overall residential loan production market in the United States has tripled in size since 2000, from $1.0 trillion to $2.9 trillion at the end of 2006, Countrywide has grown nearly three times faster, going from $62 billion in loan originations in 2000 to $463 billion in 2006."

74.     In addition, Countrywide directly and indirectly motivated its branch managers, loan officers and brokers to market the loans that would earn the highest premiums on the secondary market without regard to borrower ability to repay.  For example, the value on the secondary market of the loans generated by a Countrywide branch was an important factor in determining the branch's profitability and, in turn, branch manager compensation.  Managers were highly motivated to pressure their loan officers to sell loans that would earn Countrywide

HAGENS BERMAN
SOBOL SHAPIRO LLP

1301 FIFTH AVENUE, SUITE 2900 ● SEATTLE, WA 98101
TELEPHONE (206) 623-7292 ● FACSIMILE (206) 623-0594

1    the highest premium on the secondary market, which resulted in aggressive marketing of such

2    loan to consumers.

3         75.    The secondary market affected Countrywide's pricing of products and, in order

4    sell more loans on the secondary market, Countrywide relaxed its underwriting standards and

5    liberally granted exceptions to those standards.  Countrywide managers and executives,

6    including but not limited to defendants Mozilo and Sambol, had access to information that

7    provided transparency and a seamless connection between secondary market transactions, the

8    loan production process, and managerial and sales incentives.

9    **E.    Countrywide Corrupts the Appraisal System**

10        **1.    Countrywide's inflated appraisals**

11        76.    According to Mark Zachary, a former Regional Vice President of Countrywide's

12   joint venture with KB Home, Countrywide Mortgage Ventures, LLC, the Company blatantly

13   ignored its underwriting policies and procedures.  In September 2006, Mr. Zachary informed

14   Countrywide executives that there was a problem with appraisals performed on KB Home

15   properties being purchased with Countrywide's loans.  KB Home is one of the largest

16   homebuilders in the nation.  According to Mr. Zachary, Countrywide executives knew that

17   appraisers were strongly encouraged to inflate appraisal values by as much as 6% to allow

18   homeowners to "roll up" all closing costs.  According to Mr. Zachary, this practice resulted in

19   borrowers being "duped" as to the values of their homes.  This also made loans more risky

20   because when values were falsely increased, loan-to-value ratios calculated with these phony

21   numbers were necessarily incorrect.

22        77.    Mr. Zachary also believed this practice misled investors who later purchased these

23   loans through securitizations because these investors were not made aware that the actual home

24   values were less than the inflated appraised values.  According to Mr. Zachary, the inflated

25   appraised values put buyers "upside down" on their homes immediately after purchasing them;

26   that is, the borrowers immediately owed more than their homes were worth.  Thus, the buyers

HAGENS BERMAN
SOBOL SHAPIRO LLP

1301 FIFTH AVENUE, SUITE 2900 ● SEATTLE, WA 98101
TELEPHONE (206) 623-7292 ● FACSIMILE (206) 623-0594

1   were set up to be more susceptible to defaulting on their loans.  This practice also put

2   Countrywide at risk because it was unaware of the true value of the assets on which the

3   Company was loaning money.

4          78.     Mr. Zachary brought his concerns to executives of the Countrywide/KB Home

5   joint venture, as well as Countrywide executives in Houston, the Company's Employee Relations

6   Department and the Company's Senior Risk Management Executives.

7          79.     According to Mr. Zachary, the Company performed an audit investigating these

8   matters in January 2007, and the findings of the audit corroborated his story.  According to

9   Mr. Zachary, the findings of this audit were brought to the attention of Countrywide executives.

10         80.     On information and belief, the inflated appraisal practice was not limited to KB

11  Home but was a common feature of many loans.  As such it was essential to defendants' scheme

12  that there be a pool of appraisers who would play ball – *i.e.*, inflate their appraisals.

13       **2.**      **The blacklisting of honest appraisers**

14         81.     Part of Countrywide's scheme to increase market share and to make as many

15  loans as possible involved the corruption of the appraisal process.  Countrywide wanted

16  appraisals that supported the loans it wished to make.

17         82.     To accomplish this objective, Countrywide has engaged in a pattern and practice

18  of pressuring appraisers to write an appraisal designed to have the loan underwritten even if the

19  appraisal violates USPAP.  In other words, Countrywide is more interested in having the

20  property pass appraisal than it is in determining whether an appraisal is fair and accurate and

21  prepared in accordance with industry standards.  If an appraiser does not "play ball" and produce

22  a report affirming the property value or parameters that Countrywide expects or wants, it places

23  the appraiser on its "Field Review List," or some list of exclusion ("Exclusion List").  These are

24  fraudulent acts on the part of Countrywide, which as set forth below, are also undertaken by

25  LandSafe.

26

HAGENS BERMAN
SOBOL SHAPIRO LLP
1301 Fifth Avenue, Suite 2900 ● Seattle, WA 98101
TELEPHONE (206) 623-7292 ● FACSIMILE (206) 623-0594

83.     The Field Review List or Exclusion List is a Countrywide database containing the names of appraisers whose reports Countrywide will not accept unless the mortgage broker also submits a report from a second appraiser.  The practical effect of being placed on the Field Review List is to be "blacklisted" – no mortgage broker will hire an appraiser appearing on the Field Review List to review a property sale in which Countrywide will be the lender because the broker simply will not pay to have two appraisals done.  Instead, the broker will simply retain another appraiser who is not on the Field Review List.

84.     While an honest lender might have a legitimate purpose to maintain a list of appraisers it was unwilling to use, for example appraisers who have been sanctioned by their state licensing boards or otherwise determined after process to be unqualified, Countrywide and LandSafe had no such legitimate purpose with respect to its Field Review List.  Countrywide and LandSafe falsely and fraudulently used their exclusionary lists to punish and retaliate against appraisers who even attempted to maintain the designed integrity and independence of the appraisal process.

85.     Thousands of appraisers have been placed on the Field Review List.  Countrywide and LandSafe have used the Field Review List or Exclusionary List for more than four years.

86.     When someone on the Countrywide "do not use" database comes up on an appraisal submitted to Countrywide, the appraisal is automatically flagged for a "field review" or "2055" form.  A field review is an appraisal that reviews the original appraisal.  As a matter of course, if Countrywide flags an appraisal, all of these field reviews go to LandSafe.  The "field review" is a code or message for LandSafe to shoot holes in the original appraisal and appraise the property lower or pursuant to Countrywide's wishes.  By this scheme, LandSafe works with Countrywide to enforce its "do not use" list.

87.     Plaintiff submitted an appraisal that was flagged for a "field review."  The review found several purported issues with the appraisal and deemed it inadequate.  But when the same value was turned in on the same property by another appraiser in Plaintiff's offices under a

HAGENS BERMAN
SOBOL SHAPIRO LLP

1301 FIFTH AVENUE, SUITE 2900 ● SEATTLE, WA 98101
TELEPHONE (206) 623-7292 ● FACSIMILE (206) 623-0594

1  different company name, the same value that had been attacked by LandSafe was accepted

2  without a field review.  Plainly this evidences fraud on the part of Countrywide and LandSafe

3  and specific false statements in their communications to Plaintiff and review of his appraisals.

4  The appraisal was only "reviewed" and was only deemed inadequate when it was submitted by

5  Plaintiff.  An additional false and fraudulent statement by LandSafe was its use of improper

6  appraisal practices in order to attack one of Plaintiff's appraisals, including misstating distance of

7  alleged comparables from the subject property.

8          88.      The chilling effect of the blacklist is significant.  Because Countrywide is so

9  huge, all or a substantial portion of these loans may wind up being submitted to Countrywide.

10  Since the broker can't rule out that Countrywide may be the ultimate lender, and since they know

11  from the blacklist that a field review will be required if they choose a blacklisted appraiser, they

12  won't use Plaintiff or others on the blacklist for the appraisal because there exists the real

13  possibility of the requirement of a field review, coupled with doubling the appraisal cost to the

14  broker's applicant and the working knowledge that LandSafe will knock down the appraised

15  valuation, thereby inhibiting approval of the loan.

16          89.      LandSafe is a "captive" puppet of Countrywide, either by virtue of ownership or

17  economic power as its largest client, such that LandSafe knows what Countrywide wants to

18  accomplish with its blacklist and facilitates Countrywide's scheme by attacking the appraisals of

19  persons on the list and challenging valuations, whether warranted or not.  LandSafe's separate

20  incorporation allows the Enterprise to falsely project independence between loan origination and

21  property valuation.

22          90.      Plaintiff Capitol West has been subjected to the Countrywide scheme.

23  Countrywide representatives pressured Capitol West to increase valuations or vary from the

24  USPAP on appraisals that Capitol West provided for three separate loan transactions.  These are

25  specific examples of fraudulent acts by Countrywide's loan officers.

26

HAGENS BERMAN
SOBOL SHAPIRO LLP
1301 FIFTH AVENUE, SUITE 2900 ● SEATTLE, WA 98101
TELEPHONE (206) 623-7292 ● FACSIMILE (206) 623-0594

91.    Capitol West refused to succumb to Countrywide's pressure to compromise its integrity and independence and refused to commit fraud and violate federal and state laws. Its reward? Countrywide fraudulently placed Capitol West on the Field Review List. Capitol West learned this from a Countrywide employee.

92.    Capitol West does not stand alone. The following are examples of experiences of other appraisers, each of whom did business with Countrywide or LandSafe and were blacklisted by Countrywide and/or LandSafe:

(a)    Confidential Witness 1 ("CW 1") reports as follows:

> I created an appraisal for Countrywide and they made a loan of $420k on 4/21/2005. Later, there was a second independent mortgage placed on the property for $140k on 7/7/2005 by JP Morgan Chase.
>
> Subsequently Countrywide, while packaging loans to sell, had a review performed at $400k +/- on my appraisal of $700k. The appraised home was in Canyon Lake where 90% are speculative and custom homes. *I was placed on their Blacklist without notice*.
>
> One of my clients notified me of this action and I immediately called and spoke with Dorothy Lim of Countrywide 4/6/2006. I was told I could appeal the decision, however, I thought my appraisal was "slightly excessive," again slightly, with the review value being at the bottom of the market.
>
> I have never had any previous problems with any lender, state or other governing body in the industry. I chose to take my penance, wait for a year, further my education to Certified status, get FHA approved and try again. I have since accomplished this.
>
> I called and spoke to Dorothy 10/15/2008 and was denied removal from the blacklist. Again I was told I could appeal just as if it was 4/6/2006 all over again.

(b)    Confidential Witness 2 ("CW 2") went from a Première appraiser after completing about 1,400 appraisals for LandSafe/Countrywide to the Review/Black List. There were about 4 appraisals that did not make value and were audited by LandSafe Quality Control Board saying they were excessive. I tried to communicate with the review appraiser with no success. However during the conversation with the review appraiser on one of the appraisals under review, he stated my appraisal was not much different than the field review and couldn't understand why

010076-11 339751 V1



HAGENS BERMAN
SOBOL SHAPIRO LLP

1301 FIFTH AVENUE, SUITE 2900 ● SEATTLE, WA 98101
TELEPHONE (206) 623-7292 ● FACSIMILE (206) 623-0594

it was still under review.  When the appraisal did not make the value they would call many times and ask if there was anyway to up the value as they were saying that they weren't applying any pressure but could I please re-look at the comps and try to up the value.

(c)    Confidential Witness 3 ("CW 3") was taken off Countrywide's appraiser list due to a review by an appraiser who was biased in the property being reviewed.  The property was a NEW manufactured home which sold for $83,000. The review came in at $46,000.  The reviewer used sales which were foreclosure sales and ages ranging from 2 to 7 years old, and saying the sales were in similar condition to that of a NEW home. A NEW car is not the same as an OLD car.  The reason for the review was due to the property being foreclosed.  My Sale 1 is a property in the same subdivision, an identical home as the subject, sold for $86,500 and financed by Countrywide.

It appears to be a situation of POOR underwriting or a situation where the homeowner fell on bad times for some reason.

However, a review appraisal has put me on a blacklist. I have not been able to receive work from Countrywide since 2002. I am a current member of the Appraisal Institute and in the process of working towards my SRA designation.  I have been appraising since 1983.

(d)    Confidential Witness 4 ("CW 4") has been a Countrywide "preferred" appraiser for many years and was doing a considerable amount of work for LandSafe/Countrywide until 12-18 months ago.  Then the work pretty much stopped coming in.  I am fully aware that Countrywide/LandSafe is still ordering work from other appraisers in this area who aren't on the "preferred" list, who have many less years of experience than I, and are known for "hitting the number the lender wants" without pointing out any negative things.

So yes, after being an appraiser for 32+ years, I am disheartened by Countrywide's dishonest business practices.  Because of their size and appraisal management company, Countrywide has purposefully chosen to make loans using poor quality appraisals completed by appraisers who give them what they want to hear. And I believe they used their in-house polling system to identify the specific appraisers that would – and would not – get work.

HAGENS BERMAN
SOBOL SHAPIRO LLP
1301 FIFTH AVENUE, SUITE 2900 ● SEATTLE, WA 98101
TELEPHONE (206) 623-7292 ● FACSIMILE (206) 623-0594

1

### 3.     LandSafe Also Blacklists or Excludes Honest Appraisers

2       93.     LandSafe also fraudulently created its own "blacklist" or "Exclusion List" that

3   applied to work on Countrywide loans.  An appraiser from Florida, Confidential Witness 5

4   ("CW 5"), describes his experience with LandSafe as follows:

5           I was "black listed" from Countrywide because I was unwilling to
            comply with their underwriting guidelines which would have
6           caused me to present appraisals with misleading and non-credible
            results.  I have been doing appraisals for Countrywide for Decades,
7           and was the VERY FIRST EDI approved Landsafe appraiser in
            Florida in the early '90s.
8
            According to local Countrywide Mortgage offices, I was deemed
9           "uncooperative" by Landsafe, and was blacklisted.  The local
            branches protested, to no avail.
10
            This has devastated my business, as nearly all local mortgage
11          brokers broker to Countrywide.  If they continue to use me, a
            mandatory review appraisal is required at an additional cost to the
12          broker of $350! (though Landsafe only pays the appraiser $150!!).

13          I was informed of my removal, after a review of 7 appraisals I had
            completed (out of about 50 in a several month period).  Oddly
14          enough, each of the appraisals reviewed came in below sale price,
            or below LandSafe's "target" value (what they say is a USPAP
15          legal "qualifying value"!!!)

16          Lastly, I attempted to report this to a supposedly separate
            "Appraiser Independence Hotline" at Landsafe, only to have the
17          same individual who reviewed the appraisals answer the phone!
            How is that for appraiser independence!
18
        94.     Another example comes from Confidential Witness 6 ("CW 6"):
19
            I was asked to reconsider appraisals that had been completed.  A
20          Landsafe representative would call and indicate that based on other
            "sales" that the value should be changed.  The "sales" turned out to
21          be properties in an AVM (Automated Valuation Model).  These
            were not actual closed sales but were properties which the AVM
22          applied to them.  When I asked them to provide these "sales" they
            would not.

23

24

25

26

SECOND AMENDED CLASS ACTION COMPLAINT - 27
Case No. 2:08-cv-01520 RAJ

010076-11  339751 V1

HAGENS BERMAN
SOBOL SHAPIRO LLP
1301 Fifth Avenue, Suite 2900 ● Seattle, WA 98101
TELEPHONE (206) 623-7292 ● FACSIMILE (206) 623-0594

**F.    The Impact of Countrywide's Unlawful Conduct on Capitol West**

95.    Any appraiser placed on Countrywide's Field Review List will lose substantial revenue.  Indeed, many appraisers on Countrywide's Field Review List struggle to stay in business.

96.    Mr. Massey was regularly pressured to change the values of his appraisals by brokers.  Typically a broker would call Mr. Massey and ask if they provided him with additional information about the property if Mr. Massey would consider increasing the value he had assigned to the property.  Because appraisers should take all information into consideration when arriving at a value Mr. Massey was willing to consider additional information if he had not yet completed his report, but he did not always deem the additional information sufficient to increase the value of a property.  In numerous instances, despite pressure from brokers, Mr. Massey refused to change the values of his appraisals.  Mr. Massey recalls four instances in which Countrywide wholesale representative Devin Fahrner asked him to change a value on an appraisal report.  The last instance in which he refused to change a value happened just a few weeks prior to Mr. Massey being placed on the Unacceptable Vendor List ("UVL") in 2008.  Since Mr. Massey refused to change the value, the loan could not be funded and the mortgage was never completed.

**G.    Wade Massey of Capitol West Appraisals was Denied Fair Procedure**

97.    Wade Massey of Capitol West Appraisals was informed, in a letter sent via U.S. Mail on March 11, 2008, that he had already been placed on the UVL.  The letter was signed by Dorothy Lim, an employee of Countrywide in Westlake Village, California.  The letter informed Mr. Massey that his appraisal reports were no longer acceptable because of concerns with his appraisal reports for two properties:  one at Upper Fitchs Point Rd., Garden Valley, Idaho and the other at 8585 W. Rioja St., Star, Idaho.  Mr. Massey was given 30 days to refute Countrywide's findings in writing.  This letter from Countrywide did not identify any provision of USPAP, licensing laws, or any code that Mr. Massey had violated.  CHL-0000000254-255.

HAGENS BERMAN
SOBOL SHAPIRO LLP
1301 FIFTH AVENUE, SUITE 2900 ● SEATTLE, WA 98101
TELEPHONE (206) 623-7292 ● FACSIMILE (206) 623-0594

1        **1.     Upper Fitchs Point Rd. Appraisal**

2        98.     One of the appraisal reports that Countrywide's notice letter identified as

unacceptable was located at 21 Upper Fitchs Point Rd.  Mr. Massey valued this property at

$358,000.  Countrywide's letter briefly identified three inadequacies in Mr. Massey's report as

determined by LandSafe:

        (1)     Two appraisal reports were generated for this property and the first report

identified the transaction as a refinance and the second report identified the transaction as a

purchase.  These reports both had the same effective date but different report dates.

        (2)     The appraisal report indicated that the subject property was listed in the

Multiple Listing Service (MLS) with an asking price of $329,000.  Countrywide found that Mr.

Massey's opinion value of $358,000 was illogical.

        (3)     Countrywide concluded that the comparable properties relied upon by Mr.

Massey were "excessively distant" and the gross living area (GLA) of the comparables was

significantly larger than the subject property.  CHL-0000000254.

These were false and fraudulent statements by Countrywide and LandSafe in furtherance

of the scheme.  In rebuttal, Mr. Massey offered supported and justifiable responses to each

concern raised by Countrywide.  Mr. Massey explained as follows:

        (1)     Two appraisal reports were generated because the appraisal was initially

mistakenly ordered as a refinance transaction, but it should have been designated a purchase

transaction.  No factor affecting the appraisal had changed, so the effective date of the report

remained the same.  Mr. Massey was on vacation in the interim between the initial report for the

refinance transaction and the secondary report describing the transaction as a purchase.  This

resulted in different report dates.  As required by USPAP, Mr. Massey properly disclosed the

change made to the report.  *See* CHL-0000000075.

        (2)     Mr. Massey clarified that the original listing price of the subject property

was $378,000, but the property owner began reducing the price of the property in hopes of

SECOND AMENDED CLASS ACTION COMPLAINT - 29
Case No. 2:08-cv-01520 RAJ

010076-11  339751 V1

HAGENS BERMAN
SOBOL SHAPIRO LLP
1301 FIFTH AVENUE, SUITE 2900 ● SEATTLE, WA 98101
TELEPHONE (206) 623-7292 ● FACSIMILE (206) 623-0594

1  quickly selling the property to raise money in response to family financial difficulties resulting

2  from family medical problems.  Thus, the MLS listing of $329,000 was likely *below* the market

3  value.  Mr. Massey concluded that $358,000 was the fair and market-supported value of the

4  property.

5          (3)  The subject property is located in Garden Valley, Idaho, a rural Idaho

6  town[1] with distant properties.  As required by USPAP, Mr. Massey properly disclosed that he

7  relied upon comparables outside a one-mile radius and a six-month time frame.  Mr. Massey also

8  described his reasoning in relying on these comparables.  He noted the fact that the properties

9  were incorrectly described in the MLS listings, and explained why he believed his opinion of

10  value was supported.  CHL-0000000251-252.

11      99.  On March 14, 2008, Countrywide's Dorothy Lim sent Mr. Massey's explanations

12  via electronic mail to LandSafe's UVL Review and particularly asked Jo Hallum of LandSafe to

13  review Mr. Massey's rebuttal. CHL-0000000250.  Ms. Hallum's review of Mr. Massey's rebuttal

14  was a sham.  It was merely a cut-and-paste from LandSafe's initial review of the Upper Fitchs

15  Point appraisal.  *Compare* CHL-00000000010 and CHL-0000000244.  Ms. Hallum's subsequent

16  evaluation identified no violations of USPAP, or any other legal provision, and neither did she

17  substantively respond to Mr. Massey's rebuttal in her purported review.  Instead, Ms. Hallum

18  simply and fraudulently recommended that Mr. Massey's appraisals be deemed "unacceptable."

19  Ms. Lim emailed Mr. Massey's rebuttal to Ms. Hallum at 2:12 p.m. on Friday, March 14, 2008.

20  Ms. Hallum responded on Monday, March 17, 2008 at 3:18 p.m.  This is insufficient time to

21  adequately respond to Mr. Massey's rebuttal.  On information and belief, Ms. Hallum is not an

22  appraiser licensed in the state of Idaho.

23

24

25      [1] Recent data on Garden City, Idaho lists the town's population as 2,213 people with a very
low population density of 2.3 people per square mile.  *See* http://www.city-

26  data.com/city/Garden-Valley-Idaho.html

SECOND AMENDED CLASS ACTION COMPLAINT - 30
Case No. 2:08-cv-01520 RAJ

HAGENS BERMAN
SOBOL SHAPIRO LLP
1301 Fifth Avenue, Suite 2900 ● Seattle, WA 98101
TELEPHONE (206) 623-7292 ● FACSIMILE (206) 623-0594

1           **2.**       **Rioja Street Appraisal**

2           100.    The second appraisal report on which Countrywide relied as support for

3 blacklisting Mr. Massey was an appraisal of property at 8585 W. Rioja St. in Star, Idaho. Mr.

4 Massey appraised the property for $730,000. Again, LandSafe conducted an entire review of

5 this appraisal (*see* CHL-0000000190-234), but Countrywide's notice letter to Mr. Massey only

6 raised three concerns with the appraisal:

7                (1)    The appraisal reported the incorrect owner for the subject property.

8 Although this was a purchase transaction, the report listed the same name for the owner and the

9 borrower.

10              (2)    The appraisal failed to consider and analyze the subject's marketing

11 history. Countrywide concluded that it was illogical for the subject property to be worth more

12 than the MLS listing price.

13              (3)    Countrywide concluded that the comparable properties relied upon by Mr.

14 Massey were "excessively distant" and the gross living area (GLA) of the comparables was

15 significantly larger than the subject property. CHL-0000000254-255.

16        These were false and fraudulent statements by Countrywide made in furtherance of the

17 scheme.

18        101.    In rebuttal, Mr. Massey offered the following explanations to address

19 Countrywide's concerns:

20              (1)    Mr. Massey explained that the mistake for the owner of public record of

21 the property should have been identified by the underwriters and could easily have been

22 corrected by addendum, but Mr. Massey was not made aware of the mistake until after the report

23 was submitted and was given no opportunity to correct the error.

24              (2)    Mr. Massey acknowledged that the previous listings for the Rioja property

25 were nonsensical. He explained that he also used private listings not available on MLS to assess

26

HAGENS BERMAN
SOBOL SHAPIRO LLP
1301 FIFTH AVENUE, SUITE 2900 ● SEATTLE, WA 98101
TELEPHONE (206) 623-7292 ● FACSIMILE (206) 623-0594

1    the property's value and described his reasoning for reaching a value that, in Mr. Massey's

2    professional opinion, was supportable.

3              (3)     As an appraiser, USPAP imposes limits on the comparables available to an

4    appraiser.  Mr. Massey explained that the comparables he used were the best available to him at

5    the time of the appraisal and he weighted his comparisons accordingly.  CHL-0000000251-253.

6    102.    Again, Ms. Lim of Countrywide provided this rebuttal via email to Ms. Hallum at

7    LandSafe, but there is no record of any review or response to Mr. Massey's rebuttal conducted

8    by anyone at Countrywide or LandSafe.  Again, nowhere in Countrywide's communication with

9    Mr. Massey are any violations of USPAP or any law noted, nor is any meaningful review or

10   response given to Mr. Massey's rebuttal.

11   103.    On March 18, 2008, Mr. Massey was informed by Dorothy Lim that his

12   explanation was not "credible" and that he did not satisfactorily refute Countrywide's findings.

13   CHL-0000000243.  Mr. Massey was then  placed on the Unacceptable Vendor List and has no

14   longer been permitted to complete appraisals for Bank of America or Countrywide.

15   104.    Countrywide and LandSafe's review process of appraisers was a façade used to

16   justify the blacklisting of honest appraisers.  Mr. Massey was not placed on the UVL for any

17   wrongdoing, nor was he given a meaningful review when he offered rebuttal evidence explaining

18   the concerns raised in his reports.  The reasons provided for Countrywide's concerns with Mr.

19   Massey's work were pretextual; in fact, Mr. Massey was placed on the list because, a few weeks

20   prior to receiving notice he was on the Unacceptable Vendor List, Mr. Massey had refused to

21   "push value" on a loan.

22   105.    As evidenced in documents produced by Defendants, the decision to place Mr.

23   Massey on the blacklist was made jointly by Countrywide and LandSafe out of their California

24

25

26

SECOND AMENDED CLASS ACTION COMPLAINT - 32
Case No. 2:08-cv-01520 RAJ

010076-11  339751 V1

HAGENS BERMAN
SOBOL SHAPIRO LLP
1301 FIFTH AVENUE, SUITE 2900 ● SEATTLE, WA 98101
TELEPHONE (206) 623-7292 ● FACSIMILE (206) 623-0594

1    offices.  Countrywide Account Executives[2] in Idaho, such as Devin Fahrner received a call from

2    a LandSafe employee informing him that Massey was on the "blacklist."  The list is maintained

3    on the Countrywide website.

4         106.    Mr. Fahrner described Massey as "honest," "hard working" and "knowledgeable."

5    Deposition of Devin Fahrner, Sept. 11, 2009 ("Fahrner Dep."), at 70.  Mr. Fahrner believes that

6    Massey was put on the blacklist as a result of work Massey did on an appraisal involving a

7    property on Upper Fitchs Road.  Fahrner believed Massey "did nothing wrong."  Fahrner Dep. at

8    82:23.  The changes Massey made to the appraisal were fully disclosed in Mr. Massey's

9    appraisal report and did not change the substance of the appraisal:  "we basically changed the

10   components of the loan, but, in effect, the exposure to the client and Countrywide was still the

11   exact same ...."  *Id.* at 83:24-84:2.  The borrower did not change, the value of the property did

12   not change, and from Countrywide's perspective the loan was the same before and after the

13   changes made by Massey.  *Id.* at 84-85.

14        107.    A Countrywide employee told Fahrner that when they came across an appraisal

15   that raised any questions as to accuracy, they "didn't have time … to determine if guilt was

16   really there," they just excluded the appraiser.  *Id.* at 121.

17        108.    The impact of being on the list was explained by broker Devin Fahrner:

18             Q.    And in your experience, if somebody was on the
       Countrywide UVL, did that mean that a broker simply wouldn't
19     use them for fear of the loan ending up at Countrywide?

20             Objection to form.

21             THE WITNESS:  That's correct, either via direct
       origination or a third party, such as where I went after
22     Countrywide.  Because oftentimes the broker would be unaware
       that it might end up there and unaware of what might come during
23     the process.

24

25        [2] An Account Executive is the principal link between Countrywide and the members of its
     brokerage network.  The primary responsibility of an Account Executive is to assist brokers in
26   delivering loans to Countrywide.

SECOND AMENDED CLASS ACTION COMPLAINT - 33
Case No. 2:08-cv-01520 RAJ

HAGENS BERMAN
SOBOL SHAPIRO LLP
1301 FIFTH AVENUE, SUITE 2900 ● SEATTLE, WA 98101
TELEPHONE (206) 623-7292 ● FACSIMILE (206) 623-0594

1    Fahrner Dep. p. 63:4-14.

2        109.    The effect of Wade Massey's blacklisting continues to this day.  For example, a

3    loan officer at Metro Capital Mortgage of Boise, Idaho, informed Mr. Massey in October 2009

4    that "she found out that Wade is on Bank of America's blacklist and we sell a lot of loans to

5    them and that's why we had to remove him."  Likewise, in October 2009, Mr. Massey was

6    informed by Keith at SecoLink, an affiliate of Key Bank, that he was "on the Bank of America

7    ineligible list … and [because] Key Bank sells their loans to Bank of America [SecoLink] can't

8    send work to any appraiser that is on that list …."

9        110.    Mr. Massey has been informed by other mortgage brokers that if the broker uses

10   Mr. Massey as the appraiser, Countrywide will not do business with that broker.  Such brokers

11   included Mortgage Integrity, Clearwater Mortgage, Pathfinders Mortgage and America Home

12   Key.

13       111.    Since appearing on the Field Review List, Plaintiff Capitol West's business has

14   declined and revenues have plummeted.  Indeed, Capitol West is now losing $8,000 in revenue

15   per month as a direct and proximate result of being placed on the Field Review List.  An

16   employee of Countrywide has advised Capitol West that it will remain on the Field Review List

17   for at least a full year.  The practical result of the blacklist is that mortgage brokers simply will

18   not use Capitol West on many transactions because the broker does not know if Countrywide

19   will be the lender at the outset.

20       112.    The Mortgage Brokers who did business with Defendants were willing

21   participants in the enterprise as evidenced by the following example from Confidential Witness 7

22   ("CW 7"):

23           I never spoke with anyone from Countrywide, all pressure came
             from Mortgage Brokers.  This started early 2005….  Several times
24           I was told to disregard a certain negative aspect of the subject
             (location, condition) and retake photos either from a different angle
25           or to remove certain pictures and wording from a report.  As noted
             above, all communications were through different Mortgage
26           Brokers…. I had heard of this, and thought it meant that any work

SECOND AMENDED CLASS ACTION COMPLAINT - 34
Case No. 2:08-cv-01520 RAJ

HB

HAGENS BERMAN
SOBOL SHAPIRO LLP

1301 FIFTH AVENUE, SUITE 2900 ● SEATTLE, WA 98101
TELEPHONE (206) 623-7292 ● FACSIMILE (206) 623-0594

1

2

3

4

> that was turned in by myself or anyone else in my company would
> have to undergo a field review. Which in turn would mean the
> broker I was working with would then have to pay for this review.
> There were several times that I offered to pay for the review in
> hopes that Countrywide would see the quality of my work and take
> me off this list.

113.    The impact goes beyond damage to Plaintiff and the proposed Class. Indeed,

Countrywide's actions denigrate the integrity of the appraisal process on a wide scale, as inflated

appraisals become "comparables" used in other appraisals, leading to layers of overvaluations

and distorting prices in the marketplace.

**H.    Another Example of the Blacklist Scheme**

114.    The operation of the scheme is described in a recent action entitled *Brubaker &*

*Associates, Inc. v. LandSafe Appraisal Services, Inc. and Countrywide Home Loans, Inc.*,

No. 2009-57318, District Court of Harris County, Texas. The complaint's allegations are

summarized below.

115.    Brubaker & Assoc. is an appraisal company with its main office in Houston,

Texas, and the company has been in business since 1988. The company performs approximately

six to ten thousand (6,000 – 10,000) appraisals a year and employs approximately eighteen (18)

appraisers. Brubaker & Assoc. is one of the largest independently owned appraisal companies in

Texas. Michael Brubaker, the company's founder and principal, has been an active Texas

appraiser since 1982, and he earned his SRA designation from The Appraisal Institute (then

called the Society of Real Estate Appraisers) in 1988.

116.    On August 10, 2006, LandSafe solicited Brubaker to join the newly-formed

Countrywide Premier Program. LandSafe promised Brubaker more appraisal orders if he and the

company would agree to lower fees. On August 18, 2006, in return for the promise of the

benefits associated with participation, specifically a greater volume of business, Brubaker

reluctantly agreed to reduce fees and joined the Countrywide [LandSafe] Premier Program.

Rather than provide the promised business volume, Countrywide and LandSafe instead



SECOND AMENDED CLASS ACTION COMPLAINT - 35
Case No. 2:08-cv-01520 RAJ

HAGENS BERMAN
SOBOL SHAPIRO LLP

1301 FIFTH AVENUE, SUITE 2900 ● SEATTLE, WA 98101
TELEPHONE (206) 623-7292 ● FACSIMILE (206) 623-0594

1  blacklisted Brubaker and substantially reduced Brubaker's business volume from LandSafe and
2  from other unrelated sources as well.

3      117.    Brubaker's problems with LandSafe began after May 14, 2007, when Michael
4  Brubaker personally appraised 33203 West Haddon Court, Fulshear, Texas, for Excel Mortgage
5  Group, and its borrower Patricia Hamilton, at a fair market value of $3.5 million.  On July 17,
6  2007, at LandSafe's direction, Celso Torres performed a "field" review for LandSafe that
7  included his inspection of the property and supported Brubaker's West Haddon Court value.

8      118.    Subsequently, LandSafe's in-house appraiser, Sarah McClure, performed a "desk"
9  review of the West Haddon Court property from her office in Plano, Texas, without the benefit
10  of a personal inspection.  She valued the property at only $1.5 million, approximately $2 million
11  less than the value assigned by both of the appraisers who actually saw the property.
12  Countrywide and LandSafe invited Brubaker to defend his appraised value and, on August 1,
13  2007, Brubaker provided a comprehensive written explanation of his appraised value, in which
14  he identified additional supporting comparables and disputed and refuted McClure's $1.5 million
15  value.

16      119.    LandSafe did not respond to Brubaker's August 1, 2007 analysis, or to his
17  additional comparables, until November 6, 2007, when LandSafe's Appraisal Audit Resolution
18  Committee took issue with the Haddon Court appraisal and two other appraisals performed by
19  Brubaker – 1115 China Grove, Rosharon, Texas, and 11 Lakewood Lane, Seabrook, Texas.
20  Each of the three properties LandSafe chose to dispute is unique, and thus required numerous
21  adjustments from the best available comparables.  LandSafe went out of its way to select
22  properties for which honest appraisers can have legitimate differences of opinion, but in each
23  case LandSafe's audit letter nevertheless complained about those aspects of the reports directly
24  attributable to the unique nature of the properties.  Again, in writing, Brubaker responded in
25  explicit detail to LandSafe' s complaints about the three appraisals, but Brubaker never received
26  any rebuttal or the written results promised in LandSafe's November 6, 2007 audit inquiry.

SECOND AMENDED CLASS ACTION COMPLAINT - 36
Case No. 2:08-cv-01520 RAJ

010076-11 339751 V1

HAGENS BERMAN
SOBOL SHAPIRO LLP
1301 FIFTH AVENUE, SUITE 2900 ● SEATTLE, WA 98101
TELEPHONE (206) 623-7292 ● FACSIMILE (206) 623-0594

120.     Compass Bank, a lender which had done business with Brubaker for over a decade, subsequently called Brubaker to say it could not use Brubaker because Countrywide and LandSafe would not accept Brubaker's appraisals.  Until Countrywide and LandSafe compelled Compass Bank to seek appraisals elsewhere, Compass Bank was one of the largest clients of Brubaker & Assoc., and Compass Bank would still be a client of Brubaker & Assoc.  Brubaker alleges that it has lost other customers as a result of Defendants' wrongful acts and omissions.

121.     LandSafe set up a sham appeal process which Brubaker worked through in an attempt to persuade LandSafe to reconsider its decision to blacklist both Michael Brubaker individually and Brubaker & Assoc.  In addition to blacklisting Michael Brubaker, who had personally prepared and signed the three appraisals questioned by LandSafe, Brubaker & Assoc. was also blacklisted by LandSafe pursuant to a reported policy that appraisals performed by any of the numerous other appraisers at Brubaker & Assoc. were not acceptable to LandSafe.

122.     A sudden firm-wide ban of all appraisers who worked for Brubaker & Assoc. was part of LandSafe's plan to destroy Brubaker's business, and make an example of an honest and independent appraiser with a significant presence in the Houston market.  While Bank of America and LandSafe had no qualms about destroying the reputations of appraisers who had done nothing even allegedly improper other than work for Brubaker & Assoc., thus creating the impression that these individuals were inadequate or had done something worthy of being placed on a blacklist, at the same time Bank of America and LandSafe actively solicited Brubaker's appraisers to work for them, and actually hired some of them.  Bank of America and LandSafe knew that their alleged concerns about these appraisers were a sham.

123.     Brubaker's customers have reported that LandSafe will not accept appraisals from Brubaker & Assoc. regardless of who prepares them.  LandSafe has indicated to Brubaker over the telephone (and on information and belief to third parties) that Brubaker's status with LandSafe is "Tier 4," which is the lowest rating that LandSafe has for appraisers.  Merely working for Brubaker was enough to get more than a dozen other innocent appraisers blacklisted

HAGENS BERMAN
SOBOL SHAPIRO LLP
1301 FIFTH AVENUE, SUITE 2900 ● SEATTLE, WA 98101
TELEPHONE (206) 623-7292 ● FACSIMILE (206) 623-0594

1    too, without any trappings of the superficial and phony "process" that was employed to condemn

2    Michael Brubaker.

3    **I.    Stock Sales of Mozilo and Sambol**

4        124.    Both Mozilo and Sambol realized profits on sales of Countrywide stock in 2005,

5    2006, and 2007, through stock sales pursuant to various 10b5-1 plans.  From May 9, 2005, when

6    the Form 10-Q for the first quarter of 2005 was filed, through the end of 2007, Mozilo exercised

7    stock options and sold the underlying shares for total proceeds of at least $260 million, and

8    Sambol exercised stock options and sold the underlying shares for total proceeds of at least $40

9    million.

10    **J.    Governmental Actions Relating to Countrywide's Practices**

11        125.    Within the past year, Countrywide and its officers have come under tremendous

12    scrutiny for the practices alleged in this Complaint.

13        126.    On or about October 18, 2007, the U.S. Securities & Exchange Commission

14    began informally investigating the insider stock sales of Countrywide's Chief Executive Officer,

15    Angelo Mozilo.  Mr. Mozilo – who was paid $142 million last year and was the seventh highest

16    paid CEO in the United States – has sold nearly $300 million in Countrywide shares since 2005

17    pursuant to the Company's prearranged selling program.  Further, after October 2006, when

18    Mr. Mozilo put a new selling program in place at Countrywide, he raised the number of shares

19    executives could sell, from 350,000 shares in October 2006, to 580,000 shares in February 2007,

20    when shares were at a high of $45.03 per share.  These stock programs provided an incentive for

21    the Defendants, and the top officials of Countrywide, to develop and implement the scheme

22    alleged in this Complaint.

23        127.    On June 4, 2009, the SEC formally charged Mozilo and Sambol with securities

24    fraud.

25

26

SECOND AMENDED CLASS ACTION COMPLAINT - 38
Case No. 2:08-cv-01520 RAJ

010076-11  339751 V1

HB

HAGENS BERMAN
SOBOL SHAPIRO LLP

1301 Fifth Avenue, Suite 2900 ● Seattle, WA 98101
TELEPHONE (206) 623-7292 ● FACSIMILE (206) 623-0594

128.    On October 6, 2008, in response to criticism from regulators and advocacy groups, Countrywide announced a multi-state settlement of the AG Actions, pursuant to which it would offer certain prospective relief, including a limited loan modification program.

129.    As is noted above, the Derivative Action that was brought against Countrywide, in which it was alleged that Countrywide essentially abandoned its underwriting standards, recently survived a motion to dismiss, in an opinion in which Judge Mariana R. Pfaelzer found a "strong inference of a Company-wide culture that, at every level, emphasized increasing loan origination volume in derogation of underwriting standards." Derivative Action Order, 554 F. Supp. 2d at 1058. The Court noted that numerous confidential witnesses, mostly former employees of Countrywide, who had been quoted in the complaint presented a "striking[]" story of "rampant disregard for underwriting standards" at Countrywide in the interest of pushing through as many loans as possible. *Id.* at 1059. This scheme of pushing quantity over quality, including a lack of any analysis of reasonable criteria to ascertain the appropriateness of the loans Countrywide issued to its borrowers, was uniformly concealed from borrowers, just as it was concealed from the public. *Id.* at 1057 (holding that plaintiffs had presented a "cogent and compelling inference" that the defendant Countrywide executives had misled the public about the "rigor of Countrywide's loan origination process, the quality of its loans, and the Company's financial situation – even as they realized that *Countrywide had virtually abandoned its own loan underwriting practices*") (emphasis added).

## V.    CLASS ACTION ALLEGATIONS

130.    Plaintiff brings all claims herein as class claims pursuant to Rule 23 of the Federal Rules of Civil Procedure. The requirements of subparts 23(a) and 23(b)(2), and (b)(3) are met with respect to the Class defined below.

### A.    Class Definition

131.    Plaintiff brings this action on behalf of itself and on behalf of all certified appraisers nationwide who have been blacklisted or otherwise outed as an approved appraiser by

SECOND AMENDED CLASS ACTION COMPLAINT - 39
Case No. 2:08-cv-01520 RAJ

010076-11 339751 V1

HAGENS BERMAN
SOBOL SHAPIRO LLP

1301 FIFTH AVENUE, SUITE 2900 ● SEATTLE, WA 98101
TELEPHONE (206) 623-7292 ● FACSIMILE (206) 623-0594

1  Countrywide, Bank of America and/or LandSafe without prior notice and/or with a notice that

2  did not comply with federal or state law.  Excluded from the proposed Class are any individual

3  or corporation employed or controlled by Countrywide and/or Landsafe, and any person or entity

4  related to it, and all governmental entities and any appraiser who has been delisted by any

5  regulatory authority or who is not a certified or licensed appraiser.

6  **B.    Numerosity**

7          132.    The Class is so numerous that joinder of all members is impracticable.  Class

8  members number in the thousands.  The precise number of Class members and their addresses

9  are unknown to the Plaintiff, but can be obtained from Defendants' records.

10  **C.    Commonality**

11         133.    There are questions of law or fact common to the Class, including at least the

12  following:

13                 (a)     Whether Defendants created and maintained a Field Review List or

14  "Watch List" or "do not use" database;

15                 (b)     Whether Defendants pressured appraisers into producing appraisal reports

16  that misstated the value of the subject properties or were not in conformance with USPAP;

17                 (c)     Whether Defendants used the wires and mails to further the scheme;

18                 (c)     Whether Defendants violated RICO;

19                 (d)     Whether Defendants' wrongful conduct resulted in economic damage to

20  Plaintiff and members of the Class, and the amount of said damages; and

21                 (e)     What relief should be imposed in favor of the Plaintiff and the Class.

22  **D.    Typicality**

23         134.    Plaintiff's claims are typical of the claims of the other members of the Class.

24  Plaintiff has the same interests in this matter as all other members of the Class, and its claims are

25  substantially identical to and typical of the claims of all members of the Class.  Plaintiff does not

26  have interests antagonistic to or in conflict with those of the members of the Class.

SECOND AMENDED CLASS ACTION COMPLAINT - 40
Case No. 2:08-cv-01520 RAJ

010076-11  339751 V1

HAGENS BERMAN
SOBOL SHAPIRO LLP
1301 Fifth Avenue, Suite 2900 ● Seattle, WA 98101
TELEPHONE (206) 623-7292 ● FACSIMILE (206) 623-0594

**E.     Adequacy**

135.    Plaintiff is committed to pursuing this action and has retained competent counsel experienced in class actions.  Plaintiff will fairly and adequately represent the interests of the Class members.

**F.     The Prerequisites to Maintaining a Class Action for Injunctive Relief are Readily Apparent**

136.    The prerequisites to maintaining a class action for injunctive relief exist:

a.      If injunctive relief is not granted, great harm and irreparable injury to Plaintiff and the members of the Class will continue; and

b.      Plaintiff and the members of the Class have no adequate remedy at law for the injuries which are threatened to recur, in that, absent action from this Court, Defendants will continue to violate RICO and cause damage.

137.    The prosecution of separate actions by members of the Class would create a risk of establishing incompatible standards of conduct for Defendants – for example, one court might decide that the challenged actions are illegal and enjoin them, while another court might decide that those same actions are not illegal.  Individual actions may, as a practical matter, be dispositive of the interests of the Class.

138.    Defendants' actions are generally applicable to the Class as a whole, and Plaintiff seeks, *inter alia*, equitable remedies with respect to the Class as a whole.

**G.     Common Questions Predominate, and the Class Action Device Is Superior**

139.    The common questions of law and fact enumerated above predominate over questions affecting only individual members of the Class, and a class action is the superior method for fair and efficient adjudication of the controversy.  The likelihood that individual members of the Class will prosecute separate actions is remote due to the time and expense necessary to conduct such litigation.  To Plaintiff's knowledge, no similar litigation is currently

HAGENS BERMAN
SOBOL SHAPIRO LLP
1301 FIFTH AVENUE, SUITE 2900 ● SEATTLE, WA 98101
TELEPHONE (206) 623-7292 ● FACSIMILE (206) 623-0594

1  pending by other members of the Class. Plaintiff's counsel, highly experienced in class actions,

2  foresee little difficulty in the management of this case as a class action.

3  **VI.    FRAUDULENT CONCEALMENT; TOLLING; ESTOPPEL**

4  140.    Any applicable statutes of limitations have been tolled by Defendants' illegal

5  practices. Defendants have fraudulently concealed from Plaintiff and the Class the truth about

6  the unlawful practices described herein, thereby tolling the running of applicable statutes of

7  limitation.

8  141.    Plaintiff and the Class could not have reasonably discovered Defendants'

9  practices as alleged herein earlier than they did.

10  142.    Defendants are estopped from relying on any statute of limitations defense.

11  **VII.    CAUSES OF ACTION**

12  **FIRST CAUSE OF ACTION**

13  **VIOLATION OF 18 U.S.C. § 1962(C)(D)**

14  143.    Plaintiff, on behalf of itself and all others similarly situated, realleges and

15  incorporates herein by reference each of the allegations contained in the preceding paragraphs of

16  this Complaint.

17  144.    This cause of action, which alleges violations of Section 1962(c) of RICO, 18

18  U.S.C. § 1962(c), is asserted against the Defendants on behalf of the Class.

19  145.    Plaintiff, each Class member, and each Defendant is a "person," as that term is

20  defined in 18 U.S.C. § 1961(3).

21  146.    At all relevant times, in violation of 18 U.S.C. § 1962(c), the Defendants

22  conducted the affairs of certain association-in-fact enterprises identified herein, the affairs of

23  which affected interstate commerce through a pattern of racketeering activity, and engaged in a

24  conspiracy in violation of 1962(d).

25

26

SECOND AMENDED CLASS ACTION COMPLAINT - 42
Case No. 2:08-cv-01520 RAJ

HAGENS BERMAN
SOBOL SHAPIRO LLP
1301 FIFTH AVENUE, SUITE 2900 ● SEATTLE, WA 98101
TELEPHONE (206) 623-7292 ● FACSIMILE (206) 623-0594

**A.     The Enterprises**

      **1.     The Countrywide Brokerage Enterprise**

      147.     The RICO "enterprise" is an association-in-fact entitled the "Countrywide Broker Enterprise" consisting of: (1) Countrywide, including its separately incorporated LandSafe loan closing services subsidiaries, (2) Mortgage Integrity, Home Mortgage Resources, Hunter Creek Mortgage, Clearwater Mortgage, New Line Mortgage, Path Finders Mortgage and American Home Key, and (3) other mortgage brokers who have contracts with Countrywide pursuant to which they sell, arrange, promote, or otherwise assist Countrywide in directing borrowers into loans issued by Countrywide.

      148.     The exclusionary list is published via website that is available only to qualified mortgage brokers who do business with Countrywide. On information and belief, the mortgage brokers who are part of this enterprise have access to this list and their identities are known to Countrywide in that Countrywide provides a password to obtain access to the list. The Enterprise is ongoing and continuing business organizations consisting of both corporations and individuals that are and have been associated for the common or shared purposes of excluding selected appraisers from obtaining any business related to real estate transactions in which Countrywide or Bank of America is the mortgage lender. The Enterprise operated as a part of Countrywide's ever larger scheme to grow itself to the largest real estate lender in the United States and the scheme of its top officers to artificially inflate its stock price.

      149.     Countrywide, during the relevant time period, was the largest residential mortgage lender in the United States. It had enormous economic clout with independent mortgage brokers. Thus, Countrywide and mortgage brokers operated as a continuing unit whose major purpose and common purpose was to place as many loans with Countrywide as possible. Because the maximization of Countrywide loan originations required appraisers who would "play ball," the Countrywide Broker Enterprise had the common purpose to exclude non-compliant appraisers.

HAGENS BERMAN
SOBOL SHAPIRO LLP
1301 FIFTH AVENUE, SUITE 2900 ● SEATTLE, WA 98101
TELEPHONE (206) 623-7292 ● FACSIMILE (206) 623-0594

1      150.    The Countrywide Broker Enterprise is an ongoing organization that engages in,

2  and whose activities affect, interstate commerce.

3      151.    While all Defendants participate in and are members and part of the Countrywide

4  Broker Enterprise, they also have an existence separate and distinct from the enterprise.

5      152.    In order to successfully steer as many borrowers as possible into inappropriate

6  subprime loans and/or to write as much business as possible, Defendants need a system that

7  allows them to effectively promote these loans which included "pushing" appraisers to meet

8  contract values.  The Countrywide Broker Enterprise provides Defendants with that system and

9  ability, and their control of and participation in it is necessary for the successful operation of

10  their scheme.  Furthermore, the participation by the LandSafe subsidiaries in the Countrywide

11  Broker Enterprise allows the enterprise to function more effectively, given that many of the

12  functions provided by these entities, such as appraisals, would normally be conducted by

13  independent entities.  LandSafe' s participation in the enterprise allows the normal checks and

14  balances within the mortgage process to be eliminated, permitting Defendants to advance their

15  scheme and conceal the fraudulent activity they have been engaging in. It was important to

16  LandSafe and Countrywide that LandSafe appear to be a distinct company, *i.e.*, be separately

17  incorporated, because this allowed Countrywide and LandSafe to claim that LandSafe's appraisal

18  functions were independent of Countrywide's loan origination functions, as required by federal

19  and state regulations.  As alleged herein, such claims were false.

20      153.    The Defendants control and operate the Countrywide Broker Enterprise as

21  follows:  (a) Countrywide determines the commission structure to be paid to all Countrywide

22  brokers and authorized mortgage brokers, rewarding and incentivizing them (with increased

23  commissions, and rewards such as all-expense-paid trips to Las Vegas) to offer borrowers loans

24  with less favorable terms than they would otherwise qualify for; (b) Defendants provide

25  Countrywide brokers and authorized brokers access to its CLUES™ system, which has been

26  utilized to steer borrowers to more costly loans; (c) Defendants encourage Countrywide brokers

HAGENS BERMAN
SOBOL SHAPIRO LLP

1301 Fifth Avenue, Suite 2900 ● Seattle, WA 98101
TELEPHONE (206) 623-7292 ● FACSIMILE (206) 623-0594

1    and authorized brokers to utilize Countrywide's LandSafe subsidiaries for certain closing costs

2    associated with the loan; (d) Countrywide and LandSafe direct brokers to conduct a Field

3    Review on noncompliant appraisers or to exclude certain appraisers; and (e) Countrywide and

4    LandSafe create and send the exclusionary list to brokers.  The Countrywide Broker Enterprise

5    has a common purpose in that the brokers each wish to place business with Countrywide and/or

6    Bank of America and these banks want the business that the brokers generate.  One aspect of this

7    common purpose is that it benefits the Enterprise to exclude any appraisers that do not "play

8    ball."

9            154.    The Countrywide Broker Enterprise has an ascertainable structure separate and

10   apart from the pattern of racketeering activity in which the Defendants engage.  The structure is

11   as follows.  Countrywide establishes and maintains a list of excluded appraisers and transmits

12   that list to mortgage brokers throughout the country.  Mortgage brokers understand that if they

13   wish to place a loan with Countrywide, they must not use an excluded appraiser.

14           **2.      Alternative Enterprise Allegations:  The Countrywide Enterprise**

15           155.    Plaintiff, the Class members and Defendants are all "persons" within the meaning

16   of 18 U.S.C. § 1961(3).

17           156.    Based upon Plaintiff's current knowledge, the following persons constitute a

18   group of individuals associated in fact that will be referred to herein as the "Countrywide

19   Enterprise":  (1) Countrywide and (2) Countrywide's subsidiaries, including its LandSafe loan

20   closing services subsidiaries.  Countrywide has separately incorporated and purports to operate

21   LandSafe distinctly from itself in order to appear to comply with state and federal regulations

22   requiring independence between the loan origination process and the appraisal process.

23           157.    The Countrywide Enterprise is an ongoing organization that engages in, and

24   whose activities affect, interstate commerce.

25           158.    While all Defendants participate in and are members and part of the Countrywide

26   Enterprise, they also have an existence separate and distinct from the enterprise.

SECOND AMENDED CLASS ACTION COMPLAINT - 45
Case No. 2:08-cv-01520 RAJ

010076-11  339751 V1

HAGENS BERMAN
SOBOL SHAPIRO LLP

1301 FIFTH AVENUE, SUITE 2900 ● SEATTLE, WA 98101
TELEPHONE (206) 623-7292 ● FACSIMILE (206) 623-0594

159.    In order to successfully steer as many borrowers as possible into inappropriate subprime loans, Defendants need a system that allows them to effectively promote these loans. The Countrywide Enterprise provides Defendants with that system and ability, and their control of and participation in it is necessary for the successful operation of their scheme.  Furthermore, the participation by the LandSafe subsidiaries in the Countrywide Enterprise allows the enterprise to function more effectively, given that many of the functions provided by these entities, such as appraisals, would normally be conducted by independent entities.  LandSafe's participation in the enterprise allows the normal checks and balances within the mortgage process to be eliminated, permitting Defendants to advance their scheme and conceal the fraudulent activity they have been engaging in.

160.    The Countrywide Enterprise has an ascertainable structure separate and apart from the pattern of racketeering activity in which the Defendants engage.

161.    The Enterprises have a systemic linkage because there are contractual relationships, financial ties, and continuing coordination of activities between Countrywide, LandSafe and the brokers.  There is a common communication network by which Countrywide and the brokers shared and continued to share information on a regular basis throughout the class period.  Typically this communication occurred by use of the wires and mails in which Countrywide, LandSafe and the brokers exchanged information about properties and appraisers. Countrywide, LandSafe and the brokers functioned as a continuing unit for the purposes of implementing the Field Review List.

162.    At all relevant times, LandSafe and the brokers were aware of Countrywide's conduct; were knowing and willing participants in that conduct by refusing to hire Plaintiff and the Class members to conduct appraisals for loans being provided by Countrywide; and reaped profits from that conduct.

HAGENS BERMAN
SOBOL SHAPIRO LLP
1301 FIFTH AVENUE, SUITE 2900 ● SEATTLE, WA 98101
TELEPHONE (206) 623-7292 ● FACSIMILE (206) 623-0594

163.    The impacts of this conduct are still in place, *i.e.*, Plaintiff and the Class members are still on the Field Review List and, consequently, brokers placing loans with Countrywide refuse to hire Plaintiff and the Class members to prepare appraisals.

164.    The foregoing evidences that all Defendants are willing participants in the Enterprises; had a common purpose and interest in the establishment and operations of the foregoing scheme; and agreed to a structure wherein LandSafe, the brokers and Countrywide would bypass Plaintiff and the Class members in favor of other appraisers not on the Field Review List.  This structure was the basis on which the Enterprises operated.

**B.    The Defendants' Use of the U.S. Mails and Interstate Wire Facilities**

165.    The Enterprises engaged in and affected interstate commerce because they engaged in the following activities across state boundaries:  placing appraisers on the Unacceptable Vendor List for pretextual reasons and without due process; and the exclusion of appraisers appearing on the Field Review List from conducting appraisals.

166.    During the Class Period, the Defendants' illegal conduct and wrongful practices were carried out by an array of employees, working across state boundaries, who necessarily relied upon frequent transfers of documents, information, products and funds by the U.S. mails and interstate wire facilities.  For example, Devin Fahrner, a Countrywide Wholesale Account Executive in Boise, Idaho, was told by a Countrywide employee in California that Plaintiff Capitol West had been placed on the Field Review List.  This communication was made by interstate wires and was part of implementation of the Scheme in that it was a wire sent to exclude Massey because he refused to "push values" in violation of USPAP.

167.    Defendants used the wires and mails to violate USPAP in other fashions as well. According to a confidential witness, as part of the Scheme, staff appraisers were told and ordered to call management if the appraised value came in at or above the value on the appraisal request form.

SECOND AMENDED CLASS ACTION COMPLAINT - 47
Case No. 2:08-cv-01520 RAJ

010076-11  339751 V1



HAGENS BERMAN
SOBOL SHAPIRO LLP
1301 FIFTH AVENUE, SUITE 2900 ● SEATTLE, WA 98101
TELEPHONE (206) 623-7292 ● FACSIMILE (206) 623-0594

168.    According to this confidential witness, LandSafe used a computer program called Sidex.  Sidex would generate a "value" and appraisers were told that an appraisal that did not meet the Sidex value, would "kill the deal."  If an appraisal came in below the Sidex value, management would call the appraiser and they would be "raked over the fire with questions and pressure."  No questions were raised if the appraisal came in over value.  According to this witness, the Sidex tool was not accurate as a tool to set valves.

169.    As part of the Scheme, appraisers were told via transmissions over the Interstate wires to attend meetings with lenders to discuss how to "push values" as indicated in this email transmission between a LandSafe Field Valuation Manager, Stuart Hayashi and Bailey Greene, a loan officer at the Glendale, California Branch:

> Stuart, if you and your folks can accommodate us, the 8/11 9 am meeting, that would be ideal.  If that date doesn't work, we would also be interested in 8/18 9 am.  Let me know.  There are some things we would ideally like covered in this meeting (if you don't mind).  Those items would be:
>
> 1) Intro to you and your staff (background, history, difference between staff and premier panel appraisers)
>
> 2) Market observations, trends, issues, challenges, etc., any type of relevant insight as we see low appraisals on almost every deal now
>
> 3) *How and when we should push values* – how everyone should use the Sidex product before committing to taking a larger deal, etc….
>
> Let me know if you can help us out with the topics and the date(s).
>
> Thanks
>
> Bailey Greene
> Mgr, HLC Sales
> CMD 12 – Glendale, CA (emphasis added)

170.    The term "push values" meant that the appraisers were to come up with a value that met the contract price and did not reflect a price derived from an appraisal that conformed to USPAP.

SECOND AMENDED CLASS ACTION COMPLAINT - 48
Case No. 2:08-cv-01520 RAJ

010076-11  339751 V1

HAGENS BERMAN
SOBOL SHAPIRO LLP
1301 FIFTH AVENUE, SUITE 2900 ● SEATTLE, WA 98101
TELEPHONE (206) 623-7292 ● FACSIMILE (206) 623-0594

171.     This scheme used the mails and wires on at least the following occasions: 3/18/2008:  email Dorothy Lim of Countrywide to Capitol West; 3/17/2008:  Dorothy Lim email to LandSafe's Jo Hallum; 1/9/2008:  email Hallum to Lim and Cheryl Rowland at LandSafe; 3/17/2008:  email Lim to "USA UVL Review"; 3/11/2008:  Letter to Massey using U.S. mails. Each of these mails were sent to effectuate the scheme of excluding Mr. Massey under fraudulent pretenses.

172.     The nature and pervasiveness of the scheme, which was orchestrated out of Countrywide's offices, necessarily required those offices to communicate directly and frequently with brokers by the U.S. mails and by interstate wire facilities.

173.     Many of the precise dates of Defendants' uses of the U.S. mails and interstate wire facilities (and corresponding RICO predicate acts of mail and wire fraud) have been hidden and cannot be alleged without access to these Defendants' books and records.  However, Plaintiff can generally describe the occasions on which the RICO predicate acts of mail fraud and wire fraud occurred, and how those acts were in furtherance of the scheme.  Plaintiff describes this below.

174.     The Defendants' use of the U.S. mails and interstate wire facilities to perpetrate the scheme involved thousands of communications throughout the Class Period including telephone, email and U.S. Mail communications to brokers regarding the blacklisting of the appraisers appearing on the Field Review List or who were to be outed by Countrywide and/or LandSafe; the transmission by email and/or U.S. mail of appraisals prepared by appraisers who did not appear on the Field Review List or "out list" and the use of fraudulent HUD-1 forms to complete transactions.  In addition to these RICO predicate acts, it was foreseeable to each Defendant that it would communicate with the brokers by the U.S. mails and by interstate wire facilities.  Further, each Defendant has, in furtherance of the scheme, communicated through use of the U.S. mails and by interstate wire facilities with their various local offices or divisions.

HAGENS BERMAN
SOBOL SHAPIRO LLP
1301 FIFTH AVENUE, SUITE 2900 ● SEATTLE, WA 98101
TELEPHONE (206) 623-7292 ● FACSIMILE (206) 623-0594

1     **C.**     **Conduct of the RICO Enterprises' Affairs**

2          175.     During the Class Period, the Defendants have exerted control over the Enterprises

3 and, in violation of Section 1962(c) of RICO, the Defendants have conducted or participated in

4 the conduct of the affairs of those RICO Enterprises, directly or indirectly by controlling which

5 appraisals it would accept to qualify a loan. The brokers accepted the Defendants' control over

6 appraiser choice so that the brokers would get the loan approved and receive their commission

7 on the origination of the loan. LandSafe followed Countrywide's directives as to which

8 appraisers to target.

9          176.     The Enterprises had a hierarchical decision-making structure headed by

10 Countrywide. Countrywide created and distributed the Field Review List and/or issued

11 instructions on which appraisals that it would accept.

12     **D.**     **The Defendants' Pattern of Racketeering Activity**

13          177.     Each of the Defendants conducted and participated in the affairs of the above-

14 referenced Enterprises through a pattern of racketeering activity, including acts that are

15 indictable under 18 U.S.C. § 1341, relating to mail fraud, and 18 U.S.C. § 1343, relating to wire

16 fraud. The Defendants' pattern of racketeering likely involved thousands of separate instances of

17 use of the U.S. mails or interstate wire facilities in furtherance of their scheme. Each of these

18 fraudulent mailings and interstate wire transmissions constitutes a "racketeering activity" within

19 the meaning of 18 U.S.C. § 1961(1)(B). Collectively, these violations constitute a "pattern of

20 racketeering activity," within the meaning of 18 U.S.C. § 1961(5), in which the Defendants

21 intended to defraud Plaintiff, the members of the Class and other intended victims.

22          178.     The Defendants' racketeering activities amounted to a common course of

23 conduct, with similar pattern and purpose, intended to exclude impartial and objective appraisers,

24 that is, Plaintiff and members of the Class. Each separate use of the U.S. mails and/or interstate

25 wire facilities employed by the Defendants was related, had similar intended purposes, involved

26 similar participants and methods of execution, and had the same results affecting the same

HAGENS BERMAN
SOBOL SHAPIRO LLP
1301 FIFTH AVENUE, SUITE 2900 ● SEATTLE, WA 98101
TELEPHONE (206) 623-7292 ● FACSIMILE (206) 623-0594

1  victims, including Plaintiff and members of the Class.  Each Defendant has engaged in the

2  pattern of racketeering activity for the purpose of conducting the ongoing business affairs of the

3  Enterprises.

4  **E.     Damages Caused by the Defendants' Scheme**

5          179.     The Defendants' violations of federal law and their pattern of racketeering

6  activity have directly and proximately caused Plaintiff and members of the Class to be injured in

7  their business or property because Plaintiff and members of the Class have lost a substantial

8  amount of business by being excluded from preparing appraisals on real estate transactions

9  where Countrywide is the lender or potential buyer of the paper.

10         180.     Under the provisions of Section 1964(c) of RICO, the Defendants are jointly and

11 severally liable to Plaintiff and members of the Class for three times the damages that Plaintiff

12 and the Class members have sustained, plus the costs of bringing this suit, including reasonable

13 attorneys' fees.

14                                    **SECOND CAUSE OF ACTION**

15                          **VIOLATION OF AND CONSPIRACY TO VIOLATE**
                           **COMMON LAW DUTY TO PROVIDE FAIR PROCEDURES**
16
17                          **AGAINST COUNTRYWIDE AND BANK OF AMERICA**

18         181.     Plaintiff, on behalf of itself and all others similarly situated, realleges and

19 incorporates herein by reference each of the allegations contained in the preceding paragraphs of

20 this Complaint.

21         182.     This cause of action for violation of the common law duty to provide fair

22 procedures, and for conspiracy to violate the common law duty to provide fair procedures, is

23 asserted against the Defendants on behalf of Plaintiff and the Class.

24         183.     Defendant Countrywide is headquartered in the State of California.  On

25 information and belief, the actions and underlying decisions of Defendants alleged herein

26 emanated from and occurred within the State of California.  Decisions regarding which

SECOND AMENDED CLASS ACTION COMPLAINT - 51
Case No. 2:08-cv-01520 RAJ

010076-11  339751 V1

1   appraisers would be excluded and the review of any objections raised by an appraiser was

2   conducted at, among other places, in Countrywide's offices in West Lake Village.  Emails and

3   telephone calls implementing the Scheme emanated from West Lake Village.  California law

4   applies to the claims of Plaintiff and all Class members because the State of California has an

5   overriding interest in regulating the conduct of Defendants.  Countrywide planned and

6   implemented its wrongful scheme in California, and many of the wrongful acts emanated from

7   its California offices.

8          184.    California Civil Code section 1090.5(a) states, "No person with an interest in a

9   real estate transaction involving an appraisal shall improperly influence or attempt to improperly

10  influence, through coercion, extortion, or bribery, the development, reporting, result, or review

11  of a real estate appraisal sought in connection with a mortgage loan."  Further, section 1090.5(c)

12  states, "If a person who violates this section is licensed under any state licensing law and the

13  violation occurs within the course and scope of the person's duties as a licensee, the violation

14  shall be deemed a violation of that state licensing law."

15         185.    Moreover, in a notice dated February 4, 2009, California's Department of

16  Financial Institutions stated, "It is the jointly held intention of the Commissioners of the

17  Department of Real Estate (DRE), the Department of Corporations (DOC), the Department of

18  Financial Institutions (DFI), as well as the Director of the Office of Real Estate Appraisers

19  (OREA), to provide outreach to their respective licensees for the purpose of informing those

20  licensees that the following acts may constitute evidence of a violation of California law, and

21  Civil Code section 1090.5 in particular, and should be avoided when engaging the services of a

22  licensed real estate appraiser."  The notice then states that the unlawful acts include "allowing

23  the removal of an appraiser from a list of qualified appraisers, or the addition of an appraiser to

24  an exclusionary list of disapproved appraisers, used by any entity, *without prior written notice to*

25  *such appraiser, which notice shall include written evidence of the appraiser's illegal conduct, a*

26  *violation of the Uniform Standards of Professional Appraisal Practice (USPAP) or state*

SECOND AMENDED CLASS ACTION COMPLAINT - 52
Case No. 2:08-cv-01520 RAJ

010076-11  339751 V1

1   *licensing standards, substandard performance, improper or unprofessional behavior or other*

2   *substantive reason for removal.*"  The notice further states that its list of acts violating Civil

3   Code section 1090.5 is "intended to alert licensees of practices that could potentially lead to

4   disciplinary action."  The notice describes behavior that violates California law before or after

5   the date it was issued.  Thus, because Countrywide is licensed in California by the Department of

6   Financial Institutions, removing appraisers without giving prior notice violates section 1090.5(a)

7   and constitutes a violation of the state licensing laws.

8       186.    FHA and HUD have recently reaffirmed that appraisers cannot be placed on an

9   exclusory list without written notice and evidence of USPAP violations:

### HUD MORTGAGEE LETTER SYNOPSIS FROM ALL REGS

**FHA Reaffirms Appraiser Independence (ML 2009-28)**

Notable Date:

    Case numbers assigned on or after January 1, 2010

**Industry Participants Affected**

    All FHA Approved Lenders and FHA Roster Appraisers

**Synopsis**

    This mortgagee letter provides guidance to prevent improper influence on appraisers during the appraisal process.  The letter affirms existing requirements and introduces new requirements that are similar to HVCC (Home Value Code of Conduct) requirements.  Key guidelines follow:

            ***

- Lenders are reminded that they cannot add an appraiser to an exclusionary list without written notice and evidence of USPAP (Uniformed Standards of Professional Appraisal Practices) violations.

    187.    On September 18, 2009, HUD again reaffirmed that existing law prohibited

safeguards to isolate its collateral evaluation process from influence or interference from its loan

production process:



HAGENS BERMAN
SOBOL SHAPIRO LLP
1301 FIFTH AVENUE, SUITE 2900 ● SEATTLE, WA 98101
TELEPHONE (206) 623-7292 ● FACSIMILE (206) 623-0594

FHA is reaffirming these requirements.  Mortgagees and third parties working on behalf of mortgagees are prohibited from:

> When FHA transitioned from rotational assignment of appraisers to "Lender Select," Mortgagee Letter 1994-54 was issued to advise of the necessity for appraisal independence.  Mortgagee Letter 1994-54 prohibited loan officers and loan production staff from supervising or directing appraisers and prescribed penalties for mortgagees that unduly influenced or pressured appraisers. Subsequent Mortgagee Letters enhanced the importance of appraiser independence, and clarified and supplemented Mortgagee Letter 1994-54.   In Mortgagee Letter 1996-26, FHA directed that the mortgagee and the appraiser avoid even the appearance of a conflict of interest, which would include providing the appraiser with anything of value in consideration of returning the appraisal at a given value. With the release of Mortgagee Letter 1997-45, FHA instructed mortgagees that they may not condition continued selection of an appraiser on inflating values or disregarding repair requirements.

- Withholding or threatening to withhold timely payment or partial payment for an appraisal report.

- Withholding or threatening to withhold future business for an appraiser, or demoting or terminating or threatening to demote or terminate an appraiser.

- Expressly or impliedly promising future business, promotions or increased compensation for an appraiser.

- Conditioning the ordering of an appraisal report or the payment of an appraisal fee or salary or bonus on the opinion, conclusion or valuation to be reached, or on a preliminary value estimate requested from an appraiser.

- Requesting that an appraiser provide an estimated, predetermined or desired valuation in an appraisal report prior to the completion of the appraisal report, or requesting that an appraiser provide estimated values or comparable sales at any time prior to the appraiser's completion of an appraisal report.

- Providing to the appraiser an anticipated, estimated, encouraged or desired value for a subject property or a proposed or target amount to be loaned to the borrower, except that a copy of the sales contract for purchase must be provided.



HAGENS BERMAN
SOBOL SHAPIRO LLP
1301 FIFTH AVENUE, SUITE 2900 ● SEATTLE, WA 98101
TELEPHONE (206) 623-7292 ● FACSIMILE (206) 623-0594

- Providing to the appraiser, appraisal company, appraisal management company or any entity or person related to the appraiser, appraisal company or management company, stock or other financial or non-financial benefits.

- **Allowing the removal of an appraiser from a list of qualified appraisers or the addition of an appraiser to an exclusionary list of qualified appraisers, used by any entity, without prompt written notice to such appraiser, which notice shall include written evidence of the appraiser's illegal conduct, a violation of the Uniform Standards of Professional Appraisal Practice (USPAP) or state licensing standards, improper or unprofessional behavior or other substantive reason for removal.**

- Any other act or practice that impairs or attempts to impair an appraiser's independence, objectivity or impartiality or violates law or regulation, including, but not limited to: the Truth in Lending Act (TILA) and Regulation Z and USPAP.

188.    Defendants' failure to give any notice or to give meaningful notice to an appraiser who is removed from the list of approved appraisers, and to give the appraiser the opportunity to challenge that action and to seek relief from that action, deprives appraisers of fair procedures that are necessary to protect them from potentially devastating economic harm.

189.    As described above, Mr. Massey was removed from the list of approved appraisers or placed on a blacklist or both without adequate notice as required by law and without being provided fair procedures.  Other appraisers received no notice of being placed on the list and only learned after the fact from third parties.

190.    Similarly, all members of the Class were removed from Defendants' list of approved appraisers or placed on a blacklist or both either without fair notice and/or without otherwise being provided fair procedures to know why they were removed and to seek relief from their removal.  Thus, Defendants are liable for violating the common law duty to provide fair procedures and for conspiring to violate that duty.

SECOND AMENDED CLASS ACTION COMPLAINT - 55
Case No. 2:08-cv-01520 RAJ

010076-11  339751 V1

191.    Bank of America, without notice and any opportunity to have a fair hearing, has simply adopted Countrywide's list and thus ratified Countrywide's wrongful acts.  Countrywide representative Devin Fahrner testified that there were no significant changes in practice when Bank of America acquired Countrywide and that the two companies conducted business very similarly.  Fahrner Dep. at 75.

192.    Defendants' unlawful conduct has directly and proximately caused Plaintiff and members of the Class to be injured in that they have lost a substantial amount of business by being excluded from the list of approved appraisers without being provided fair procedures.  In addition, Plaintiff seeks an injunction requiring Defendants to cease their wrongful conduct.

193.    The acts and omissions of Defendants alleged herein were intended to cause injury to Plaintiff and the Class members and constitute despicable conduct carried on by Defendants with a willful and conscious disregards of the rights of Plaintiff and the Class members, thus constituting malice within the meaning of California Civil Code § 3294(c)(1).  The acts and omissions of Defendants alleged herein also subjected Plaintiff and the Class members to cruel and unjust hardship in conscious disregard of their rights, thus constituting oppression within the meaning of Civil Code § 3294(c)(2).  As a result, Plaintiff and the Class members are entitled to an award of punitive damages.

### THIRD CAUSE OF ACTION

### INTERFERENCE WITH PROSPECTIVE ECONOMIC ADVANTAGE AGAINST COUNTRYWIDE

194.    Plaintiff, on behalf of itself and all others similarly situated, realleges and incorporates herein by reference each of the allegations contained in the preceding paragraphs of this Complaint.

195.    This cause of action, which alleges interference with prospective economic advantage, is asserted on behalf of the Class.

SECOND AMENDED CLASS ACTION COMPLAINT - 56
Case No. 2:08-cv-01520 RAJ

010076-11  339751 V1

1    196.    California law applies to the claims of Plaintiff and all Class members, because

2    Countrywide has its headquarters in California.  Defendants planned and implemented their

3    wrongful scheme in California, which thus has an overriding interest in regulating the conduct of

4    Defendants.

5    197.    The mortgage brokers that Mr. Massey had relationships with include Mortgage

6    Integrity, Home Mortgage Resources, Hunter Creek Mortgage, Clearwater Mortgage, New Line

7    Mortgage, Pathfinders Mortgage and American Home Key.  Countrywide was aware the Plaintiff

8    and Massey had business relationships with each of these entities and that placing Massey on an

9    exclusion list would interfere and damage that relationship.

10    198.    Plaintiff and all Class members have economic relationships with mortgage

11    brokers and mortgage lenders.  Defendants knew about those relationships and intentionally and

12    successfully engaged in the conduct alleged in this Complaint for the purpose of disrupting those

13    relationships.

14    199.    Defendants' interference is purposeful.  It is the intent and objective of the

15    exclusionary program to interfere with Plaintiff and Class members' economic relationships with

16    mortgage brokers.  Defendants communicate the blacklist status of appraisers to mortgage

17    brokers for the very purpose of ceasing these brokers from doing business with Plaintiff and

18    Class members.

19    200.    Defendants' conduct is wrongful in that it either is part of a RICO violation, or

20    violates California law as set forth above.

21    201.    In a sworn affidavit filed in this case, Dorothy Lim identified herself as the

22    Countrywide employee in charge of the blacklist and swore that "I did not have direct

23    communications with mortgage brokers about it."  Dkt. No. 46.  This sworn statement was

24    misleading because Countrywide posts the list on a database and provides mortgage brokers with

25    a password to have access to the blacklist.  Former Countrywide Wholesale Account Executive

26    Devin Fahrner stated under oath that he was told by a Countrywide employee in California that

HAGENS BERMAN
SOBOL SHAPIRO LLP

1301 FIFTH AVENUE, SUITE 2900 ● SEATTLE, WA 98101
TELEPHONE (206) 623-7292 ● FACSIMILE (206) 623-0594

1    Wade Massey had been placed on the Unacceptable Vendor List.  The purpose of sending the list

2    to mortgage brokers is to interfere with a broker's use of blacklisted appraisers.

3         202.    Countrywide knows that the mortgage brokers who do business with Massey will

4    see his exclusion and cease doing business with him.

5         203.    Defendants' unlawful conduct has directly and proximately caused Plaintiff and

6    members of the Class to be injured in their business or property because Plaintiff and members

7    of the Class have lost a substantial amount of business by being excluded from preparing

8    appraisals on real estate transactions where Countrywide is the lender or potential buyer of the

9    paper.

10                                    **PRAYER FOR RELIEF**

11        WHEREFORE, Plaintiff prays for relief and judgment, as follows:

12        A.      Determining that this action is a proper class action and designating Plaintiff as

13   representative of the Class under Rule 23 of the Federal Rules of Civil Procedure;

14        B.      Awarding compensatory damages in favor of Plaintiff and the Class members

15   against all Defendants, jointly and severally, for all damages sustained as a result of Defendants'

16   wrongdoing, in an amount to be proven at trial, including interest thereon;

17        C.      Awarding treble damages;

18        D.      Entering an injunction barring Defendants from engaging in the unlawful conduct

19   alleged herein;

20        E.      Awarding Plaintiff and the Class members their reasonable costs and expenses

21   incurred in this action, including counsel fees and expert fees; and

22        F.      Such other and further relief as the Court may deem just and proper.

23

24

25

26

SECOND AMENDED CLASS ACTION COMPLAINT - 58
Case No. 2:08-cv-01520 RAJ

010076-11  339751 V1

HAGENS BERMAN
SOBOL SHAPIRO LLP
1301 FIFTH AVENUE, SUITE 2900 ● SEATTLE, WA 98101
TELEPHONE (206) 623-7292 ● FACSIMILE (206) 623-0594

1

**JURY DEMAND**

2        Pursuant to Federal Rule of Civil Procedure 38(a), Plaintiff hereby demands a trial by

3    jury of all issues so triable.

4        DATED:  December 4, 2009.

5                                    HAGENS BERMAN SOBOL SHAPIRO LLP

6

7        By_____s/ Steve W. Berman_____
                Steve W. Berman, WSBA #12536
                Thomas E. Loeser, WSBA #38701
8                Ari Brown, WSBA #29570
                Genessa Stout, WSBA #38410
9        1301 Fifth Avenue, Suite 2900
        Seattle, Washington  98101
10        Telephone: (206) 623-7292
        Facsimile: (206) 623-0594
11        steve@hbsslaw.com
        toml@hbsslaw.com
12        ari@hbsslaw.com
        genessa@hbsslaw.com
13
        Raymond D. Schild
14        10280 W. Ustick Road
        Boise, Idaho  83704
15        Telephone:  (208) 672-1616
        Facsimile:  (208) 672-1901
16        rschild@fiberpipe.net

17        Attorneys for Plaintiff and the proposed Class

18

19

20

21

22

23

24

25

26

1

### <u>CERTIFICATE OF SERVICE</u>

2          On December 4, 2009, I caused to be electronically filed the foregoing with the Clerk of

3   the Court using the CM/ECF system, which will send notification of such filing to the following

4   attorneys of record:

5

6   - **Steve W. Berman**
        steve@hbsslaw.com, heatherw@hbsslaw.com
7   - **Ari Y. Brown**
        ari@hbsslaw.com, dawn@hbsslaw.com
8   - **Brooks R. Brown**
9       bbrown@goodwinprocter.com, rbader@goodwinprocter.com,
        scrobinson@goodwinprocter.com, casesonline-CA@goodwinprocter.com
10  - **John S. Devlin , III**
11      devlinj@lanepowell.com, Docketing-SEA@LanePowell.com, burrusl@lanepowell.com
    - **Thomas E. Loeser**
12      TomL@hbsslaw.com, dawn@hbsslaw.com
    - **David L. Permut**
13      dpermut@goodwinprocter.com, rpolliard@goodwinprocter.com
    - **Sallie F. Pullman**
14      spullman@goodwinprocter.com, rpolliard@goodwinprocter.com
    - **D. Michael Reilly**
15      reillym@lanepowell.com, smithm@lanepowell.com
16  - **Raymond D. Schild**
        rschild@fiberpipe.net
17  - **Genessa Ann Stout**
        genessa@hbsslaw.com
18

19

20          Executed this 4th day of December, 2009, in Seattle, Washington.

21

22          HAGENS BERMAN SOBOL SHAPIRO LLP

23

24      By:        s/ Steve W. Berman
                Steve W. Berman, WSBA #12536
25

26

SECOND AMENDED CLASS ACTION COMPLAINT - 60
Case No. 2:08-cv-01520 RAJ

010076-11 339751 V1



HAGENS BERMAN
SOBOL SHAPIRO LLP

1301 FIFTH AVENUE, SUITE 2900 ● SEATTLE, WA 98101
TELEPHONE (206) 623-7292 ● FACSIMILE (206) 623-0594